Michael F. Ram (SBN 104805)
mram@forthepeople.com
Marie N. Appel (SBN 187483)
mappel@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 358-6913
Facsimile: (415) 358-6293

Benjamin R. Osborn (to be admitted *Pro Hac Vice*)
102 Bergen St.
Brooklyn, NY 11201
Telephone: (347) 645-0464
Email: ben@benosbornlaw.com

Sam Strauss (to be admitted *Pro Hac Vice*)
sam@turkestrauss.com
Raina Borrelli (to be admitted *Pro Hac Vice*)
raina@turkestrauss.com
TURKE & STRAUSS LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703-3515
Telephone: (608) 237-1775
Facsimile: (509) 4423

*Attorneys for Plaintiffs and the Proposed Class*

THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JAMES UHARRIET, AVIVA KELLMAN, ALISON BOCKIUS, and KAREN EVANS, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br>v.<br><br>MyLife.com, Inc.,<br><br>                    Defendant. | Case No. 3:21-08229-VC<br><br>FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF CALIFORNIA, NEVADA, AND OHIO RIGHT OF PUBLICITY STATUTES; CALIFORNIA AND OHIO MISAPPROPRIATION OF NAME OR LIKENESS; AND CALIFORNIA UCL.<br><br><u>CLASS ACTION</u><br>**<u>JURY TRIAL DEMANDED</u>** |

**NATURE OF ACTION**

1.      Plaintiffs and members of the proposed classes ("Class Members") are private individuals who have no relationship with the Defendant MyLife.com, Inc. ("Defendant" or "MyLife") or the website it owns and operates at www.mylife.com. Plaintiffs and Class Members have never used mylife.com, nor did they provide their names, ages, addresses, photographs, or any other personal information to MyLife.

2.      Plaintiffs were seriously distressed to discover that MyLife is using their names, personal information, and personas to advertise paid subscriptions to its website. MyLife's advertisements suggest that Plaintiffs have criminal records and may be on sex offender lists.

3.      Plaintiffs and Class Members did not consent to MyLife using their names, personal information, photographs, and personas to advertise website subscriptions or any other product.

4.      MyLife advertises its website by publicly displaying teaser profiles of Plaintiffs and Class Members with their names, ages, current and past cities of residence, workplaces, and other personal information. Some teaser profiles include photographs.

5.      MyLife advertises that it possesses additional information about Plaintiffs and Class Members including: "embarrassing online photos that [Plaintiff or Class Member] doesn't want you to see"; "Negative Items on [Plaintiff's or Class Member's] Public Reputation Profile"; "sensitive information & graphic content" such as their "Sex Offender Status"; "Criminal & civil court records" including "Felonies" and "Misdemeanors"; "satellite pictures" of their "known addresses"; the identities of their "spouse, parents, siblings, children, grandparents, & other family members"; and their "Financial Data" including "estimated income, net worth, [and] home value." MyLife advertises that if users purchase a subscription plan starting at $10.95 per month, they will receive access to a full profile including this additional information about Plaintiffs and Class Members, as well as full profiles containing similar information about millions of other individuals.

6.      Defendant also uses Plaintiffs' and Class Members' personal information and

personas to advertise its "Premium Membership" service. Only by purchasing Defendant's "Premium Membership," which requires monthly payments of $7.95, can subscribers modify, remove, or prevent others from seeing potentially embarrassing or harmful personal information about the subscriber on mylife.com.

7.     MyLife publishes a "Reputation Score" associated with Plaintiffs and Class Members. The "Reputation Score" is determined by MyLife and is purportedly based on the personal information MyLife has gathered about Plaintiffs and Class Members. MyLife advertises that users who pay $10.95 per month will receive, as part of their subscription, access to the "Reputation Scores" of Plaintiffs, Class Members, and millions of additional individuals. MyLife advertises that users who pay $7.95 for a "Premium Membership" will receive the ability to "Correct, Enhance & Monitor" their "Reputation Score," which MyLife claims "could affect your life both personally and professionally."

8.     MyLife does not present Plaintiffs' and Class Members' profiles as "samples" advertising the purchase of a single profile containing additional information. Rather, MyLife uses Plaintiffs' and Class Members' names and personas to advertise subscriptions to mylife.com.

9.     At a cost of $10.95 per month, a mylife.com subscription includes far more than access to the profile of the individual whose persona MyLife used to advertise the subscription. A subscription delivers access to the full profiles of millions of individuals, including potentially embarrassing information, "Reputation Scores" determined by MyLife, and the ability to "See everyone else who is also looking at" each profile.

10.     At a cost of $7.95 per month, a "Premium Membership" subscription to MyLife delivers not just access to one's own profile, but a variety of services purportedly designed to improve the subscriber's online reputation. The advertised services include the ability to: "Correct Background Facts & Edit" the subscriber's MyLife profile; "lock[] sections" of the subscriber's profile from being seen by others; display an "Excellent Reputation Badge Publicly" on the subscriber's profile; and "See Who's Searching for" the subscriber.

11.     MyLife is the sole author, designer, and implementor of the advertising

techniques and messages giving rise to this lawsuit. MyLife does not host user-generated content on or in any part of the website relevant to this lawsuit. MyLife is the sole curator, designer, and creator of the content described in this Complaint, including the teaser profiles representing Plaintiffs and Class Members, the "Reputation Scores" corresponding to Plaintiffs and Class Members, and the advertisements soliciting subscriptions.

12.   Plaintiffs do not know how MyLife obtained their names, cities of residence, names of relatives, and additional personal information. MyLife states on its website that it "aggregates publicly available information from government, social, and other sources, plus personal reviews written by others." MyLife does not disclose specific sources.

13.   MyLife misappropriated Plaintiffs' and Class Members' names, personal information, and personas without permission or consent from Plaintiff or Class Members. Indeed, Plaintiffs and Class Members must pay money to MyLife to have some of their personal information removed. Yet even after "Premium Membership" subscribers have paid this unconscionable fee, MyLife continues to advertise using a teaser profile of the subscriber.

14.   Consent is not all or nothing. Plaintiffs and Class Members may have shared their names, addresses, and other personal information with companies or the government in a variety of contexts. For example, Plaintiffs or Class Members may have shared their names and addresses with a private company when making a credit card purchase.

15.   But Plaintiffs and Class Members did not consent to the commercial use of their personal information and personas to promote subscriptions to a website with which they have no relationship. MyLife makes money by (1) peddling purportedly embarrassing personal information; and (2) pressuring subscribers into paying to remove embarrassing information from MyLife and improve their "Reputation Scores," which are entirely invented by MyLife. Plaintiffs and Class Members did not consent to the use of their personas to promote MyLife's unethical schemes.

16.   California, Nevada, and Ohio law recognize the intellectual property and privacy rights of individuals in controlling the use of their names, photographs, likenesses, and personas for commercial purposes.

17.     By using Plaintiffs' and Class Members' names, likenesses, photographs, and personas in advertisements for website subscriptions without consent, MyLife has violated their intellectual property and privacy rights. Plaintiffs and Class Members have the right not to have their personas exploited to promote a product with which they have no relationship and no interest in supporting. Plaintiffs and Class Members have an economic interest in their personas, which MyLife has stolen, and a privacy interest in their personas, which MyLife has violated.

18.     By these actions, MyLife has violated California's Right of Publicity statute, codified in Cal. Civ. Code § 3344; California common law prohibiting misappropriation of a name or likeness; Ohio's Right of Publicity statute, codified in Ohio Rev. Code § 2741; Ohio common law prohibiting misappropriation of a name or likeness; Nevada's Right of Publicity statute, codified in Nev. Rev. Stat. §§ 597.790 *et seq.*; and California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*. Plaintiffs and Class Members have suffered injury through the unlawful taking of their valuable intellectual property; through the invasion of their privacy rights protected by statute and common law; through MyLife's unlawful profiting from its exploitation of their names, personas, and personal information; and through harm to peace of mind. Plaintiffs and Class Members are entitled to relief including statutory damages, disgorgement of profits, royalties for the use of their names and personas, restitution of the value of their names and personas, an injunction prohibiting MyLife's unlawful conduct, an award of attorneys' fees, expenses, and costs, and declaratory and injunctive relief.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) (the Class Action Fairness Act ("CAFA")), because: (A) at least one Class Member is a citizen of a state different from at least one defendant. Defendant MyLife is incorporated in Delaware and has its principal place of business in Los Angeles, California. Plaintiffs assert claims on behalf of a nationwide class, which includes members from every state in the country. (B) Each of the proposed Classes – including the two proposed sub-Classes limited to residents of Ohio and Nevada – consists of at least 100 members. And (C) the amount in controversy exceeds

$5,000,000 exclusive of interest and costs based on the California statutory claims alone. Cal. Civ. Code § 3344 provides for statutory damages "equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered," as well as "any profits from the unauthorized use." The statute also allows for punitive damages and an award of attorneys' fees and costs. Because MyLife is a California corporation using the names and personal information of hundreds of millions of individuals to advertise its website, the amount in controversy is well over the jurisdictional limit.

20.    This Court has general personal jurisdiction over MyLife because its headquarters and principal place of business are in this state.

21.    This Court has specific personal jurisdiction over MyLife because a significant portion of the events giving rise to this lawsuit occurred in this state, including: MyLife's design and creation of the advertisements incorporating Plaintiffs' and Class Members' names, likenesses, and personas; MyLife's copying of Plaintiffs' and Class Members' personal information from a variety of online sources; MyLife's display of Plaintiffs' and Class Members' teaser profiles in advertisements available to the public online; MyLife's failure to obtain required consent from Class Members who reside in California; and MyLife's violation of the intellectual property rights of Class Members who reside in California.

22.    Plaintiffs Uharriett and Kellman reside in this state and District. MyLife violated their intellectual property rights and misappropriated their names, personal information, and personas, the locus of which is in this state and District. MyLife failed to obtain the required consent from Plaintiffs Uharriett and Kellman in this state and District. MyLife displayed the advertisements using Plaintiffs' names, personal information, and personas in this state and District.

23.    Plaintiffs Bockius and Evans do not reside in California. However, Mylife's illegal use of Plaintiff Bockius' and Evans' names, likenesses, photographs, and personas in advertisements for website subscriptions without their consent in violation of their intellectual property and privacy rights originated from and was directed by MyLife from its California headquarters.

24.     Venue is appropriate pursuant to 28 U.S.C. § 1391(b). A substantial portion of the events and conduct giving rise to the violations alleged in this complaint occurred in this district.

## PARTIES

25.     Plaintiff James Uharriet is a citizen of California. Mr. Uharriet resides in San Mateo, California. Mr. Uharriet has never used or subscribed to the website mylife.com. MyLife publicly displays a teaser profile of Mr. Uharriet's personal information, including his name, city of residence, and relatives' names, which it uses to advertise subscriptions. MyLife claims to be in possession of additional information about Mr. Uharriet, including his "Sex Offender Status," his supposed "Felonies" and "Misdemeanors," "satellite pictures" of his current and past addresses, "estimated income, net worth, [and] home value," and "embarrassing online photos that James doesn't want [the user] to see." MyLife advertises subscriptions to its website by promising subscribers the ability to view, modify, or block this additional potentially embarrassing information about Mr. Uharriet.

26.     Plaintiff Aviva Kellman is a citizen of California. Ms. Kellman resides in Alameda, California. Ms. Kellman has never used or subscribed to the website mylife.com. MyLife publicly displays a teaser profile of Ms. Kellman's personal information, including her name, city of residence, and relatives' names, which it uses to advertise subscriptions. MyLife claims to be in possession of additional information about Ms. Kellman, including her "Sex Offender Status," her supposed "Felonies" and "Misdemeanors," "satellite pictures" of her current and past addresses, "estimated income, net worth, [and] home value," and "embarrassing online photos that Aviva doesn't want [the user] to see." MyLife advertises subscriptions to its website by promising subscribers the ability to view, modify, or block this additional potentially embarrassing information about Ms. Kellman.

27.     Plaintiff Alison Bockius is a citizen of Nevada. Ms. Bockius resides in Henderson, Nevada. Ms. Bockius has never used or subscribed to the website mylife.com. MyLife publicly displays a teaser profile of Ms. Kellman's personal information, including her name, city of residence, and relatives' names, which it uses to advertise subscriptions. MyLife

claims to be in possession of additional information about Ms. Bockius, including her "Sex Offender Status," her supposed "Felonies" and "Misdemeanors," "satellite pictures" of her current and past addresses, "estimated income, net worth, [and] home value," and "embarrassing online photos that Aviva doesn't want [the user] to see." MyLife advertises subscriptions to its website by promising subscribers the ability to view, modify, or block this additional potentially embarrassing information about Ms. Bockius.

28.     Plaintiff Karen Evans is a citizen of Ohio. Ms. Evans resides in Westerville, Ohio. Ms. Evans has never used or subscribed to the website mylife.com. MyLife publicly displays a teaser profile of Ms. Evans' personal information, including her name, city of residence, and relatives' names, which it uses to advertise subscriptions. MyLife claims to be in possession of additional information about Ms. Evans, including her "Sex Offender Status," her supposed "Felonies" and "Misdemeanors," "satellite pictures" of her current and past addresses, "estimated income, net worth, [and] home value," and "embarrassing online photos that Karen doesn't want [the user] to see." MyLife advertises subscriptions to its website by promising subscribers the ability to view, modify, or block this additional potentially embarrassing information about Ms. Evans.

29.     Defendant MyLife.com, Inc. is a Delaware corporation with its headquarters in Los Angeles, California. Defendant owns and operates the website mylife.com.

### GOVERNMENT ACTION

30.     On July 27, 2020, the Federal Trade Commission ("FTC") and Department of Justice ("DOJ") jointly sued MyLife and its founder Jeffrey Tinsely.[1] The Complaint alleges that, since 2009, MyLife has "sold their consumer background reports primarily by allowing users of their website to run free background searches for an individual's name, and then displaying search results that imply, often falsely, that the subject of a search may have records of criminal or sexual offenses—records that can only be viewed only by buying a MyLife

---

[1] *United States vs. MyLife.com, Inc. and Jeffrey Tinsley*, 2:20-cv-06692 (C.D. Cal. complaint filed July 27, 2020).

subscription."[2]

31.     The FTC and DOJ Complaint further alleges that "MyLife search results also include a 'Reputation Score' about a searched-for individual purportedly based on 'public information, gathered from government, social, and other sources, plus personal reviews written by others.' Told that '[r]eputation is more important than credit[,]' and lured by the prospect of paying a relatively small fee to uncover the individual's legal or criminal history and other information, American consumers have paid millions of dollars for MyLife premium subscriptions."[3]

32.     While Plaintiffs' complaint arises from some of the same facts as the FTC and DOJ Complaint, the two complaints state claims under different laws protecting different legal rights. The FTC and DOJ Complaint states causes of action under the FTC Act, the Telemarketing Sales Rule, the Restore Online Shoppers' Confidence Act, and the Fair Credit Reporting Act.[4] It does not address the Right of Publicity.

## FACTUAL ALLEGATIONS

### A.     James Uharriet

33.     Plaintiff James Uharriet has no relationship with MyLife. He is not a subscriber and has never used mylife.com.

34.     Mr. Uharriet has never agreed to MyLife's Terms of Service, nor has he agreed to any arbitration agreement with MyLife. Mr. Uharriet has never authorized anyone to create a MyLife account on his behalf. Mr. Uharriet has never authorized anyone to agree to arbitration with MyLife on his behalf.

35.     Mr. Uharriet did not give consent to MyLife to use his name, likeness, personal information, or persona in any way. Had MyLife requested his consent, Mr. Uharriet would not have provided it.

_____

[2] *Id.*, ECF No. 1 at ¶ 7.
[3] *Id.*
[4] *Id.*, at ¶¶ 39-72.

1

36.     MyLife uses Mr. Uharriet's name and persona in advertisements promoting its

2

website subscriptions. MyLife publicly displays a teaser profile of personal information about

3

Mr. Uharriet. The teaser profile states his name, city of residence, and names of his relatives.

4

The teaser profile uniquely identifies Mr. Uharriet. A screenshot depicting the teaser profile is

5

shown below. Mr. Uharriet's profile is the second search result. For privacy, Plaintiffs' counsel

6

have redacted the first search result and the names of Mr. Uharriet's relatives.

7

8

9

10



11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

37.     MyLife provides a publicly accessible landing page at mylife.com on which users may search, and have searched, for Mr. Uharriet by name, location, and contact information.



38.     Users who searched for Mr. Uharriet received the teaser profile uniquely identifying Mr. Uharriet by name, city of residence, and names of his relatives.

39.     MyLife uses Mr. Uharriet's teaser profile in two advertising techniques. In its first advertising technique, MyLife uses Mr. Uharriet's name, personal information, and persona to advertise a website subscription providing access to additional information about Mr. Uharriet and hundreds of millions of other individuals.

40.     Users who click on either "James Thomas Uharriet" or the button marked "View Reputation Profile" are shown a series of screens in which MyLife purports to be gathering additional "public reputation & background info on James Uharriet," including:

- "embarrassing online photos that **James** doesn't want you to see" (name bolded in original);

- "sensitive details gathered from Civil & Criminal Court records, & sexual offender list";

- "Sex Offender Status";

- Information allowing the viewer to "Determine James Uharriet's trustworthiness";

- "a full history of known addresses for **James Uharriet**" including "satellite pictures of locations, & an interactive map" (name bolded in original);

- "**James Uharriet**'s civil judgments, including the type and amount owed" (name bolded in original);

- "**James**'s contact info" (name bolded in original);

- Street address, email address, and phone number;

- "Work history" and "Education history";

- Records of "Felonies and Misdemeanors";

- "Sensitive information & graphic content," including "information that should not be shared with minors";

- "**James**'s basic information" including "properties & vehicles" he owns (name bolded in original);

- "Relatives & Associates"; and

- "Financial data."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

41.     A selection of these screens is shown below:





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## The Address & Property section of Profile



**The location section** might include a full history of known addresses for **James Uharriet**. When available, we provide satellite pictures of locations, & an interactive map, & find census data for neighborhoods. This sort of information is typically expensive to purchase on most other services.

## Lawsuits, Liens, Bankruptcy Section of Profile



The amount of litigation that someone has been involved in might say a lot about that person. You can see **James Uharriet**'s civil judgments, including the type and amount owed. **This info might be embarrassing, use with discretion.**

1
2
3
4
5
6
7
8
9

REPUTATION PROFILE READY FOR:

**James Uharriet** In Burlingame, CA

**Remember**: you might be shocked by what you find on **James Uharriet**'s Reputation Profile. **We've scanned countless places** across the Internet for revealing data, places you wouldn't look – saving you time and frustration – to create a Reputation Profile that will help you learn the truth. You might uncover social media or online dating accounts you didn't know existed, or embarrassing online photos that **James** doesn't want you to see.

CONTINUE

10    42.    After the user clicks "Continue" on the last of the screens shown above, MyLife

11   displays a payment page soliciting a subscription to mylife.com for $10.95 per month. The

12   page clearly links Mr. Uharriet's name, personal information, and persona to the purchase of a

13   subscription. The page states "We Found Negative Items On James's Public Reputation

14   Profile" on a bright red banner. In a message displayed directly beneath Mr. Uharriet's name,

15   location, and age, the MyLife urges the user to pay in order to "Get Instant Information On

16   James Now!" MyLife promises that a subscription will provide access to information not just

17   about Mr. Uharriet, but also about other individuals. Subscribers will have the ability to

18   "Search Unlimited for Friends, Neighbors and Dates" and "Check Everyone Else So You're

19   Safe."

20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14



15      43.      In its <u>second</u> advertising technique, MyLife uses Mr. Uharriet's name, personal

16  information, and persona to advertise a "Premium Membership" subscription. This advertising

17  technique targets users like Mr. Uharriet whose names, personal information, and personas

18  appear in teaser profiles on MyLife's website. MyLife warns Mr. Uharriet that (1) MyLife may

19  possess additional "sensitive" information about him; (2) this information may have affected

20  his "Reputation Profile & Public Reputation Score"; and (3) other MyLife users "Might Have

21  Viewed Your Reputation Profile." In exchange for a payment of $7.95 per month, Mr. Uharriet

22  would receive the ability to correct, edit, or prevent others from viewing his personal

23  information on mylife.com. He would also receive various tools to improve his "Reputation

24  Score" on mylife.com.

25      44.      This is unconscionable. MyLife warns Mr. Uharriet that "sensitive" information

26  in his MyLife "Reputation Profile" may be adversely affecting his reputation profile, which

27  others may have seen. But it is MyLife itself that created Mr. Uharriet's "Reputation Profile." It

28  is MyLife that distributed his full profile to its paying subscribers. And it is MyLife that

1    published his teaser profile publicly in advertisements for MyLife subscriptions.

2        45.    Users who click on the button marked "This is me – View My Report" in Mr.

3    Uharriet's teaser profile (*see above*) are shown a series of screens in which MyLife purports to

4    be "Aggregat[ing] Reputation & Background Details For You." Like the screens used in the

5    first advertising technique, these screens emphasize the "sensitive" nature of the information

6    MyLife has about Mr. Uharriet. Unlike the screens in the first technique, these screens

7    emphasize the services MyLife provides to "Help[] You Correct & Improve Your Reputation."

8    Among other statements, the screens warn Mr. Uharriet that:

9            a.      "Reputation is Everything."

10           b.      "your reputation is being looked at CONSTANTLY. It's critical that you

11   manage what's public about you."

12           c.      "MyLife Reputation Profiles show up in over 300 million online

13   searches every month."

14           d.      "People may have been looking for you."

15       46.    A selection of these screens is shown below:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





47.     After the user clicks "Continue" on the last of the screens shown above, MyLife displays a payment page soliciting a subscription for $7.95 per month. The page clearly links Mr. Uharriet's name, personal information, and persona to the purchase of a subscription. The page states "James, We Found Negative Items On Your Reputation Profile" on a bright red banner. In a larger message just below the red banner, the page says "James, To See Your Full Reputation Details With Score & More, Upgrade Now." MyLife promises that a subscription will provide not just access to his full profile, but also the ability to "Correct" and "Edit" the profile, including "locking sections until you approve," as well as the ability to "Hide Anonymous Personal Reviews."



48.     MyLife's sole purpose in using Mr. Uharriet's name, personal information, and persona on its website is to solicit the purchase of paid subscriptions to mylife.com.

49.     Mr. Uharriet does not know how MyLife obtained his name, city of residence, age, and names of his relatives. Nor does he know how MyLife obtained any of the additional "sensitive" or "embarrassing" information it purports to possess in its full profile of Mr. Uharriet.

50.     Contrary to the many insinuations MyLife published in its advertisements about Mr. Uharriet, Mr. Uharriet is not listed on any sex offender list or registry.

51.     MyLife misappropriated Mr. Uharriet's personal information and persona without permission from Mr. Uharriet or the various sources from which it presumably stole his information.

52.     Mr. Uharriet has intellectual property and privacy interests in his name, likeness, and persona recognized by California statutory and common law. He has the right to exclude anyone from making commercial use of his persona without his permission.

53.     MyLife has injured Mr. Uharriet by taking his intellectual property without compensation; by invading his privacy rights protected by statute and common law; and by unlawfully profiting from its exploitation of his personal information.

54.     MyLife's illegal actions caused Mr. Uharriet mental injury and disturbed his peace of mind. Mr. Uharriet is deeply uncomfortable in the knowledge that MyLife is using his name and persona in advertisements suggesting he has a criminal record and a history as a sex offender. Mr. Uharriet believes his persona is rightly his to control. MyLife's illegal use has left him worried and uncertain about his inability to control how his name and persona is used. Mr. Uharriet feels that MyLife's use of his name and persona is an alarming invasion of his privacy. Mr. Uharriet believes that MyLife's collection and publication of intimate personal details about him and his family members encourages and enables identity fraud. He believes MyLife's use of his personal information encourages and enables stalking and other predatory behaviors.

**B.**     **Aviva Kellman**

55.     Plaintiff Aviva Kellman has no relationship with MyLife. She is not a subscriber and has never used mylife.com.

56.     Ms. Kellman has never agreed to MyLife's Terms of Service, nor has she agreed to any arbitration agreement with MyLife. Ms. Kellman has never authorized anyone to create a MyLife account on her behalf. Ms. Kellman has never authorized anyone to agree to arbitration with MyLife on her behalf.

57.     Ms. Kellman did not give consent to MyLife to use her name, likeness, personal information, or persona in any way. Had MyLife requested her consent, Ms. Kellman would not have provided it.

58.     MyLife uses Ms. Kellman's name and persona in advertisements promoting its website subscriptions. MyLife publicly displays a teaser profile of personal information about Ms. Kellman. The teaser profile states her name, age, cities of residence, names of her relatives. The teaser profile uniquely identifies Ms. Kellman.

59.     The teaser profile depicting Ms. Kellman is publicly displayed on the MyLife website in a format substantially similar to the teaser profile for Mr. Uharriet, which appears in Paragraph 36 above.

60.     On information and belief, MyLife.com publicly displays webpages with Ms. Kellman's name and personal information in a substantially similar manner to the screenshots shown in Paragraphs 36, 41, 42, 46, and 47 for Mr. Uharriet.

61.     MyLife provides a publicly accessible landing page at mylife.com on which users may search, and have searched, for Ms. Kellman by name, location, and contact information. *See* ¶ 37.

62.     Users who searched for Ms. Kellman received the teaser profile uniquely identifying Ms. Kellman by name, age, cities of residence, and names of her relatives.

63.     MyLife uses Ms. Kellman's teaser profile in two advertising techniques. In its first advertising technique, MyLife uses Ms. Kellman's name, personal information, and persona to advertise a website subscription providing access to additional information about

Ms. Kellman and hundreds of millions of other individuals.

64.    Users who click on either "Aviva S Kellman, 41" or the button marked "View Reputation Profile" are shown a series of screens in which MyLife purports to be gathering additional "public reputation & background info on Aviva Kellman," including:

- "embarrassing online photos that **Aviva** doesn't want you to see" (name bolded in original);

- "sensitive details gathered from Civil & Criminal Court records, & sexual offender list";

- "Sex Offender Status";

- Information allowing the viewer to "Determine James Uharriet's trustworthiness";

- "a full history of known addresses for **Aviva Kellman**" including "satellite pictures of locations, & an interactive map" (name bolded in original);

- "**Aviva Kellman**'s civil judgments, including the type and amount owed" (name bolded in original);

- "**Aviva**'s contact info" (name bolded in original);

- Street address, email address, and phone number;

- "Work history" and "Education history";

- Records of "Felonies and Misdemeanors";

- "Sensitive information & graphic content," including "information that should not be shared with minors";

- "**Aviva**'s basic information" including "properties & vehicles" he owns (name bolded in original);

- "Relatives & Associates"; and

- "Financial data."

65.    The screens shown in Paragraph 41 are the same screens MyLife shows for Ms. Kellman, but with Ms. Kellman's name in place of Mr. Uharriet's.

66.    After the user clicks "Continue" on the last of the screens shown in Paragraph

41, MyLife displays a payment page soliciting a subscription to mylife.com for $10.95 per month. The page clearly links Ms. Kellman's name, personal information, and persona to the purchase of a subscription. The page states "We Found Negative Items On Aviva's Public Reputation Profile" on a bright red banner. In a message displayed directly beneath Ms. Kellman's name, location, and age, the MyLife urges the user to pay in order to "Get Instant Information On Aviva Now!" MyLife promises that a subscription will provide access to information not just about Ms. Kellman, but also about other individuals. Subscribers will have the ability to "Search Unlimited for Friends, Neighbors and Dates" and "Check Everyone Else So You're Safe."

67.    In its second advertising technique, MyLife uses Ms. Kellman's name, personal information, and persona to advertise a "Premium Membership" subscription. This advertising technique targets users like Ms. Kellman whose names, personal information, and personas appear in teaser profiles on MyLife's website. MyLife warns Ms. Kellman that (1) MyLife may possess additional "sensitive" information about her; (2) this information may have affected her "Reputation Profile & Public Reputation Score"; and (3) other MyLife users "Might Have Viewed Your Reputation Profile." In exchange for a payment of $7.95 per month, Ms. Kellman would receive the ability to correct, edit, or prevent others from viewing her personal information on mylife.com. She would also receive various tools to improve her "Reputation Score" on mylife.com.

68.    This is unconscionable. MyLife warns Ms. Kellman that "sensitive" information in her MyLife "Reputation Profile" may be adversely affecting her reputation profile, which others may have seen. But it is MyLife itself that created Ms. Kellman's "Reputation Profile." It is MyLife that distributed her full profile to its paying subscribers. And it is MyLife that published her teaser profile publicly in advertisements for MyLife subscriptions.

69.    Users who click on the button marked "This is me – View My Report" in Ms. Kellman's teaser profile (*see above*) are shown a series of screens in which MyLife purports to be "Aggregat[ing] Reputation & Background Details For You." Like the screens used in the first advertising technique, these screens emphasize the "sensitive" nature of the information

MyLife has about Ms. Kellman. Unlike the screens in the first technique, these screens emphasize the services MyLife provides to "Help[] You Correct & Improve Your Reputation." Among other statements, the screens warn Ms. Kellman that:

      a.      "Reputation is Everything."

      b.      "your reputation is being looked at CONSTANTLY. It's critical that you manage what's public about you."

      c.      "MyLife Reputation Profiles show up in over 300 million online searches every month."

      d.      "People may have been looking for you."

70.     The screens shown in Paragraph 46 are the same screens MyLife shows for Ms. Kellman, but with Ms. Kellman's name in place of Mr. Uharriet's.

71.     After the user clicks "Continue" on the last of the screens shown above, MyLife displays a payment page soliciting a subscription for $7.95 per month. The page clearly links Ms. Kellman's name, personal information, and persona to the purchase of a subscription. The page states "Aviva, We Found Negative Items On Your Reputation Profile" on a bright red banner. In a larger message just below the red banner, the page says "Aviva, To See Your Full Reputation Details With Score & More, Upgrade Now." MyLife promises that a subscription will provide not just access to her full profile, but also the ability to "Correct" and "Edit" the profile, including "locking sections until you approve," as well as the ability to "Hide Anonymous Personal Reviews."

72.     MyLife's sole purpose in using Ms. Kellman's name, personal information, and persona on its website is to solicit the purchase of paid subscriptions to mylife.com.

73.     Ms. Kellman does not know how MyLife obtained her name, city of residence, age, and names of her relatives. Nor does she know how MyLife obtained any of the additional "sensitive" or "embarrassing" information it purports to possess in its full profile of Ms. Kellman.

74.     Contrary to the many insinuations MyLife published in its advertisements about Ms. Kellman, Ms. Kellman is not listed on any sex offender list or registry.

75.     MyLife misappropriated Ms. Kellman's personal information and persona without permission from Ms. Kellman or the various sources from which it presumably stole her information.

76.     Ms. Kellman has intellectual property and privacy interests in her name, likeness, and persona recognized by California statutory and common law. She has the right to exclude anyone from making commercial use of her persona without her permission.

77.     MyLife has injured Ms. Kellman by taking her intellectual property without compensation; by invading her privacy rights protected by statute and common law; and by unlawfully profiting from its exploitation of her personal information.

78.     MyLife's illegal actions caused Ms. Kellman mental injury and disturbed her peace of mind. Ms. Kellman is deeply uncomfortable in the knowledge that MyLife is using her name and persona in advertisements suggesting she has a criminal record and a history as a sex offender. Ms. Kellman believes her persona is rightly her to control. MyLife's illegal use has left her worried and uncertain about her inability to control how her name and persona is used. Ms. Kellman feels that MyLife's use of her name and persona is an alarming invasion of her privacy. Ms. Kellman believes that MyLife's collection and publication of intimate personal details about her and her family members encourages and enables identity fraud. She believes MyLife's use of her personal information encourages and enables stalking and other predatory behaviors.

**C.     Alison Bockius**

79.     Plaintiff Alison Bockius has no relationship with MyLife. She is not a subscriber and has never used mylife.com.

80.     Ms. Bockius has never agreed to MyLife's Terms of Service, nor has she agreed to any arbitration agreement with MyLife. Ms. Bockius has never authorized anyone to create a MyLife account on her behalf. Ms. Bockius has never authorized anyone to agree to arbitration with MyLife on her behalf.

81.     Ms. Bockius did not give consent to MyLife to use her name, likeness, personal information, or persona in any way. Had MyLife requested her consent, Ms. Bockius would not

1  have provided it.

2      82.    MyLife uses Ms. Bockius' name and persona in advertisements promoting its

3  website subscriptions. MyLife publicly displays a teaser profile of personal information about

4  Ms. Bockius. The teaser profile states her name, age, cities of residence, names of her relatives.

5  The teaser profile uniquely identifies Ms. Bockius.

6      83.    The teaser profile depicting Ms. Bockius is publicly displayed on the MyLife

7  website in a format substantially similar to the teaser profile for Mr. Uharriet, which appears in

8  Paragraph 36 above.

9      84.    On information and belief, MyLife.com publicly displays webpages with Ms.

10  Bockius' name and personal information in a substantially similar manner to the screenshots

11  shown in Paragraphs 36, 41, 42, 46, and 47 for Mr. Uharriet.

12      85.    MyLife provides a publicly accessible landing page at mylife.com on which

13  users may search, and have searched, for Ms. Bockius by name, location, and contact

14  information. *See* ¶ 37.

15      86.    Users who searched for Ms. Bockius received the teaser profile uniquely

16  identifying Ms. Bockius by name, age, cities of residence, and names of her relatives.

17      87.    MyLife uses Ms. Bockius' teaser profile in two advertising techniques. In its

18  first advertising technique, MyLife uses Ms. Bockius' name, personal information, and persona

19  to advertise a website subscription providing access to additional information about Ms.

20  Bockius and hundreds of millions of other individuals.

21      88.    Users who click on either "Alison Bockius, 38" or the button marked "View

22  Reputation Profile" are shown a series of screens in which MyLife purports to be gathering

23  additional "public reputation & background info on Alison Bockius," including:

24      • "embarrassing online photos that **Alison** doesn't want you to see" (name bolded

25  in original);

26      • "sensitive details gathered from Civil & Criminal Court records, & sexual

27  offender list";

28      • "Sex Offender Status";

- Information allowing the viewer to "Determine James Uharriet's trustworthiness";

- "a full history of known addresses for **Alison Bockius**" including "satellite pictures of locations, & an interactive map" (name bolded in original);

- "**Alison Bockius'** civil judgments, including the type and amount owed" (name bolded in original);

- "**Alison**'s contact info" (name bolded in original);

- Street address, email address, and phone number;

- "Work history" and "Education history";

- Records of "Felonies and Misdemeanors";

- "Sensitive information & graphic content," including "information that should not be shared with minors";

- "**Alison**'s basic information" including "properties & vehicles" he owns (name bolded in original);

- "Relatives & Associates"; and

- "Financial data."

89.    The screens shown in Paragraph 41 are the same screens MyLife shows for Ms. Bockius, but with Ms. Bockius' name in place of Mr. Uharriet's.

90.    After the user clicks "Continue" on the last of the screens shown in Paragraph 41, MyLife displays a payment page soliciting a subscription to mylife.com for $10.95 per month. The page clearly links Ms. Bockius' name, personal information, and persona to the purchase of a subscription. The page states "We Found Negative Items On Alison's Public Reputation Profile" on a bright red banner. In a message displayed directly beneath Ms. Bockius' name, location, and age, the MyLife urges the user to pay in order to "Get Instant Information On Alison Now!" MyLife promises that a subscription will provide access to information not just about Ms. Bockius, but also about other individuals. Subscribers will have the ability to "Search Unlimited for Friends, Neighbors and Dates" and "Check Everyone Else So You're Safe."

91.     In its <u>second</u> advertising technique, MyLife uses Ms. Bockius' name, personal information, and persona to advertise a "Premium Membership" subscription. This advertising technique targets users like Ms. Bockius whose names, personal information, and personas appear in teaser profiles on MyLife's website. MyLife warns Ms. Bockius that (1) MyLife may possess additional "sensitive" information about her; (2) this information may have affected her "Reputation Profile & Public Reputation Score"; and (3) other MyLife users "Might Have Viewed Your Reputation Profile." In exchange for a payment of $7.95 per month, Ms. Bockius would receive the ability to correct, edit, or prevent others from viewing her personal information on mylife.com. She would also receive various tools to improve her "Reputation Score" on mylife.com.

92.     This is unconscionable. MyLife warns Ms. Bockius that "sensitive" information in her MyLife "Reputation Profile" may be adversely affecting her reputation profile, which others may have seen. But it is MyLife itself that created Ms. Bockius' "Reputation Profile." It is MyLife that distributed her full profile to its paying subscribers. And it is MyLife that published her teaser profile publicly in advertisements for MyLife subscriptions.

93.     Users who click on the button marked "This is me – View My Report" in Ms. Bockius' teaser profile (*see above*) are shown a series of screens in which MyLife purports to be "Aggregat[ing] Reputation & Background Details For You." Like the screens used in the first advertising technique, these screens emphasize the "sensitive" nature of the information MyLife has about Ms. Bockius. Unlike the screens in the first technique, these screens emphasize the services MyLife provides to "Help[] You Correct & Improve Your Reputation." Among other statements, the screens warn Ms. Bockius that:

        a.      "Reputation is Everything."

        b.      "your reputation is being looked at CONSTANTLY. It's critical that you manage what's public about you."

        c.      "MyLife Reputation Profiles show up in over 300 million online searches every month."

        d.      "People may have been looking for you."

94.     The screens shown in Paragraph 46 are the same screens MyLife shows for Ms. Bockius, but with Ms. Bockius' name in place of Mr. Uharriet's.

95.     After the user clicks "Continue" on the last of the screens shown above, MyLife displays a payment page soliciting a subscription for $7.95 per month. The page clearly links Ms. Bockius' name, personal information, and persona to the purchase of a subscription. The page states "Alison, We Found Negative Items On Your Reputation Profile" on a bright red banner. In a larger message just below the red banner, the page says "Alison, To See Your Full Reputation Details With Score & More, Upgrade Now." MyLife promises that a subscription will provide not just access to her full profile, but also the ability to "Correct" and "Edit" the profile, including "locking sections until you approve," as well as the ability to "Hide Anonymous Personal Reviews."

96.     MyLife's sole purpose in using Ms. Bockius' name, personal information, and persona on its website is to solicit the purchase of paid subscriptions to mylife.com.

97.     Ms. Bockius does not know how MyLife obtained her name, city of residence, age, and names of her relatives. Nor does she know how MyLife obtained any of the additional "sensitive" or "embarrassing" information it purports to possess in its full profile of Ms. Bockius.

98.     Contrary to the many insinuations MyLife published in its advertisements about Ms. Bockius, Ms. Bockius is not listed on any sex offender list or registry.

99.     MyLife misappropriated Ms. Bockius' personal information and persona without permission from Ms. Bockius or the various sources from which it presumably stole her information.

100.     Ms. Bockius has intellectual property and privacy interests in her name, likeness, and persona recognized by Nevada statutory law, and by California statutory and common law. She has the right to exclude anyone from making commercial use of her persona without her permission.

101.     MyLife has injured Ms. Bockius by taking her intellectual property without compensation; by invading her privacy rights protected by statute and common law; and by

unlawfully profiting from its exploitation of her personal information.

102.    MyLife's illegal actions caused Ms. Bockius mental injury and disturbed her peace of mind. Ms. Bockius is deeply uncomfortable in the knowledge that MyLife is using her name and persona in advertisements suggesting she has a criminal record and a history as a sex offender. Ms. Bockius believes her persona is rightly her to control. MyLife's illegal use has left her worried and uncertain about her inability to control how her name and persona is used. Ms. Bockius feels that MyLife's use of her name and persona is an alarming invasion of her privacy. Ms. Bockius believes that MyLife's collection and publication of intimate personal details about her and her family members encourages and enables identity fraud. She believes MyLife's use of her personal information encourages and enables stalking and other predatory behaviors.

**D.    Karen Evans**

103.    Plaintiff Karen Evans has no relationship with MyLife. She is not a subscriber and has never used mylife.com.

104.    Ms. Evans has never agreed to MyLife's Terms of Service, nor has she agreed to any arbitration agreement with MyLife. Ms. Evans has never authorized anyone to create a MyLife account on her behalf. Ms. Evans has never authorized anyone to agree to arbitration with MyLife on her behalf.

105.    Ms. Evans did not give consent to MyLife to use her name, likeness, personal information, or persona in any way. Had MyLife requested her consent, Ms. Evans would not have provided it.

106.    MyLife uses Ms. Evans' name and persona in advertisements promoting its website subscriptions. MyLife publicly displays a teaser profile of personal information about Ms. Evans. The teaser profile states her name, age, cities of residence, names of her relatives. The teaser profile uniquely identifies Ms. Evans.

107.    The teaser profile depicting Ms. Evans is publicly displayed on the MyLife website in a format substantially similar to the teaser profile for Mr. Uharriet, which appears in Paragraph 36 above.

108.    On information and belief, MyLife.com publicly displays webpages with Ms. Evans' name and personal information in a substantially similar manner to the screenshots shown in Paragraphs 36, 41, 42, 46, and 47 for Mr. Uharriet.

109.    MyLife provides a publicly accessible landing page at mylife.com on which users may search, and have searched, for Ms. Evans by name, location, and contact information. *See* ¶ 37.

110.    Users who searched for Ms. Evans received the teaser profile uniquely identifying Ms. Evans by name, age, cities of residence, and names of her relatives.

111.    MyLife uses Ms. Evans' teaser profile in two advertising techniques. In its <u>first</u> advertising technique, MyLife uses Ms. Evans' name, personal information, and persona to advertise a website subscription providing access to additional information about Ms. Evans and hundreds of millions of other individuals.

112.    Users who click on either "Karen Evans, 38" or the button marked "View Reputation Profile" are shown a series of screens in which MyLife purports to be gathering additional "public reputation & background info on Karen Evans," including:

- "embarrassing online photos that **Karen** doesn't want you to see" (name bolded in original);

- "sensitive details gathered from Civil & Criminal Court records, & sexual offender list";

- "Sex Offender Status";

- Information allowing the viewer to "Determine James Uharriet's trustworthiness";

- "a full history of known addresses for **Karen Evans**" including "satellite pictures of locations, & an interactive map" (name bolded in original);

- "**Karen Evans'** civil judgments, including the type and amount owed" (name bolded in original);

- "**Karen**'s contact info" (name bolded in original);

- Street address, email address, and phone number;

- "Work history" and "Education history";

- Records of "Felonies and Misdemeanors";

- "Sensitive information & graphic content," including "information that should not be shared with minors";

- "**Karen**'s basic information" including "properties & vehicles" he owns (name bolded in original);

- "Relatives & Associates"; and

- "Financial data."

113.   The screens shown in Paragraph 41 are the same screens MyLife shows for Ms. Evans, but with Ms. Evans' name in place of Mr. Uharriet's.

114.   After the user clicks "Continue" on the last of the screens shown in Paragraph 41, MyLife displays a payment page soliciting a subscription to mylife.com for $10.95 per month. The page clearly links Ms. Evans' name, personal information, and persona to the purchase of a subscription. The page states "We Found Negative Items On Karen's Public Reputation Profile" on a bright red banner. In a message displayed directly beneath Ms. Evans' name, location, and age, the MyLife urges the user to pay in order to "Get Instant Information On Karen Now!" MyLife promises that a subscription will provide access to information not just about Ms. Evans, but also about other individuals. Subscribers will have the ability to "Search Unlimited for Friends, Neighbors and Dates" and "Check Everyone Else So You're Safe."

115.   In its second advertising technique, MyLife uses Ms. Evans' name, personal information, and persona to advertise a "Premium Membership" subscription. This advertising technique targets users like Ms. Evans whose names, personal information, and personas appear in teaser profiles on MyLife's website. MyLife warns Ms. Evans that (1) MyLife may possess additional "sensitive" information about her; (2) this information may have affected her "Reputation Profile & Public Reputation Score"; and (3) other MyLife users "Might Have Viewed Your Reputation Profile." In exchange for a payment of $7.95 per month, Ms. Evans would receive the ability to correct, edit, or prevent others from viewing her personal

information on mylife.com. She would also receive various tools to improve her "Reputation Score" on mylife.com.

116.    This is unconscionable. MyLife warns Ms. Evans that "sensitive" information in her MyLife "Reputation Profile" may be adversely affecting her reputation profile, which others may have seen. But it is MyLife itself that created Ms. Evans' "Reputation Profile." It is MyLife that distributed her full profile to its paying subscribers. And it is MyLife that published her teaser profile publicly in advertisements for MyLife subscriptions.

117.    Users who click on the button marked "This is me – View My Report" in Ms. Evans' teaser profile (*see above*) are shown a series of screens in which MyLife purports to be "Aggregat[ing] Reputation & Background Details For You." Like the screens used in the first advertising technique, these screens emphasize the "sensitive" nature of the information MyLife has about Ms. Evans. Unlike the screens in the first technique, these screens emphasize the services MyLife provides to "Help[] You Correct & Improve Your Reputation." Among other statements, the screens warn Ms. Evans that:

a.    "Reputation is Everything."

b.    "your reputation is being looked at CONSTANTLY. It's critical that you manage what's public about you."

c.    "MyLife Reputation Profiles show up in over 300 million online searches every month."

d.    "People may have been looking for you."

118.    The screens shown in Paragraph 46 are the same screens MyLife shows for Ms. Evans, but with Ms. Evans' name in place of Mr. Uharriet's.

119.    After the user clicks "Continue" on the last of the screens shown above, MyLife displays a payment page soliciting a subscription for $7.95 per month. The page clearly links Ms. Evans' name, personal information, and persona to the purchase of a subscription. The page states "Karen, We Found Negative Items On Your Reputation Profile" on a bright red banner. In a larger message just below the red banner, the page says "Karen, To See Your Full Reputation Details With Score & More, Upgrade Now." MyLife promises that a subscription

will provide not just access to her full profile, but also the ability to "Correct" and "Edit" the profile, including "locking sections until you approve," as well as the ability to "Hide Anonymous Personal Reviews."

120.    MyLife's sole purpose in using Ms. Evans' name, personal information, and persona on its website is to solicit the purchase of paid subscriptions to mylife.com.

121.    Ms. Evans does not know how MyLife obtained her name, city of residence, age, and names of her relatives. Nor does she know how MyLife obtained any of the additional "sensitive" or "embarrassing" information it purports to possess in its full profile of Ms. Evans.

122.    Contrary to the many insinuations MyLife published in its advertisements about Ms. Evans, Ms. Evans is not listed on any sex offender list or registry.

123.    MyLife misappropriated Ms. Evans' personal information and persona without permission from Ms. Evans or the various sources from which it presumably stole her information.

124.    Ms. Evans has intellectual property and privacy interests in her name, likeness, and persona recognized by California statutory and common law, and by Ohio statutory and common law. She has the right to exclude anyone from making commercial use of her persona without her permission.

125.    MyLife has injured Ms. Evans by taking her intellectual property without compensation; by invading her privacy rights protected by statute and common law; and by unlawfully profiting from its exploitation of her personal information.

126.    MyLife's illegal actions caused Ms. Evans mental injury and disturbed her peace of mind. Ms. Evans is deeply uncomfortable in the knowledge that MyLife is using her name and persona in advertisements suggesting she has a criminal record and a history as a sex offender. Ms. Evans believes her persona is rightly her to control. MyLife's illegal use has left her worried and uncertain about her inability to control how her name and persona is used. Ms. Evans feels that MyLife's use of her name and persona is an alarming invasion of her privacy. Ms. Evans believes that MyLife's collection and publication of intimate personal details about her and her family members encourages and enables identity fraud. She believes MyLife's use

of her personal information encourages and enables stalking and other predatory behaviors.

## CLASS ACTION ALLEGATIONS

127.    Plaintiffs bring this action both individually and as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3). Plaintiffs seek to represent the following Classes:

> <u>Nationwide Class:</u> All people in the United States who are not MyLife subscribers and whose names and personal information MyLife incorporated in teaser profiles used to promote its MyLife memberships.

> <u>Nevada Sub-Class:</u> All Nevada residents who are members of the nationwide class.

> <u>Ohio Sub-Class:</u> All Ohio residents who are members of the nationwide class.

128.    Excluded from the proposed Classes are Plaintiffs' counsel; MyLife, its officers and directors, counsel, successors, and assigns; any entity in which MyLife has a controlling interest; and the judge to whom this case is assigned and the judge's immediate family.

129.    The members of the proposed Classes are so numerous that joinder of individual claims is impracticable. MyLife advertises that it has "Reputation Profiles and Reputation Scores for more than 325 million individuals in the U.S." Accordingly, MyLife claims to have teaser profiles on every or nearly every person in the United States. The size of the Nationwide Class is therefore close to the population of the United States, and the sizes of the Nevada and Ohio Sub-Classes are close to the populations of those states.

130.    There are significant questions of fact and law common to the members of the Nationwide Class. These include:

a.      Whether MyLife's misappropriation of names and personal information, and use of that information in the advertising techniques described in this Complaint, constitutes the knowing use without consent of another's name, photograph, or likeness on or in products or for purposes of advertising products within the meaning of Cal. Civ. Code § 3344;

b.      Whether MyLife solicited and obtained written consent from Nationwide Class Members prior to using their personas in advertisements promoting its website, as required by Cal. Civ. Code § 3344;

c.      Whether MyLife's use of Nationwide Class Members' names and personal information in advertisements and as part of their subscription products falls within the exceptions for "use in connection with any news, public affairs, or sports broadcast or account, or any political campaign" within the meaning of Cal. Civ. Code § 3344;

d.      The amount of MyLife's "profits from the unauthorized use" of Nationwide Class Members' names and personal information;

e.      Whether MyLife's conduct described in this Complaint violates California common law prohibiting misappropriation of a name or likeness;

f.      Whether Plaintiffs and Nationwide Class Members are entitled to the injunctive, declaratory, monetary, punitive, and other relief requested in this Complaint.

131.    There are significant questions of fact and law common to the members of the Nevada Sub-Class. These include:

a.      Whether MyLife's misappropriation of names and personal information, and use of that information in the advertising techniques described in this Complaint, constitutes the use of individuals' personalities for commercial purposes without previous written consent within the meaning of Nev. Rev. Stat. § 597.810;

b.      Whether Plaintiff Bockius and Nevada Sub-Class Members gave written consent to the use of their names, photographs, images, likenesses, and personalities to promote MyLife's products as required by Nev. Rev. Stat. § 597.810;

c.      Whether MyLife's use of Plaintiff Bockius' and Nevada Sub-Class Members' names, photographs, images, likenesses, and personalities is in connection with a news, public affairs, or sports broadcast or publication, *see* Nev. Rev. Stat. § 597.790;

d.      Whether MyLife's commercial use of the names, photographs, images, likenesses, and personalities of Plaintiff Bockius and Nevada Sub-Class Members was knowing, such that Plaintiff Bockius and Nevada Sub-Class Members are entitled to exemplary and punitive damages under Nev. Rev. Stat. § 597.810;

e.      Whether Plaintiff Bockius and Nevada Sub-Class Members are entitled to the injunctive, declaratory monetary, and other relief requested in this Complaint.

1      132.    There are significant questions of fact and law common to the members of the

2   Ohio Sub-Class. These include:

3              a.      Whether MyLife's misappropriation of names and personal information,

4   and use of that information in the advertising techniques described in this Complaint,

5   constitutes the use of aspects of individuals' personas for a commercial purpose without

6   previous written consent within the meaning of Ohio Rev. Code § 2741.02;

7              b.      Whether Plaintiff Evans and Ohio Sub-Class Members gave written

8   consent to the use of their names, photographs, images, likenesses, distinctive appearances, and

9   personas to promote MyLife's products as required by Ohio Rev. Code § 2741.02;

10             c.      Whether MyLife's commercial use of aspects of Plaintiff Evans' and

11  Ohio Sub-Class Members' personas was "in connection with any news, public affairs, sports

12  broadcast, or account." *See* Ohio Rev. Code § 2741.02(D)(1);

13             d.      Whether MyLife's commercial use of aspects of the of Plaintiff Evans'

14  and Ohio Sub-Class Members' personas was willful; the extent to which MyLife is able to pay

15  statutory damages; and the extent of the harm to Plaintiff Evans and Ohio Sub-Class Members,

16  all of which are relevant to determining the amount of statutory damages under Ohio Rev.

17  Code § 2741.07;

18             e.      Whether MyLife's conduct entitles Plaintiff Evans and Ohio Sub-Class

19  Members to punitive or exemplary damages under Ohio Rev. Code § 2741.07 and Ohio Rev.

20  Code § 2315.21;

21             f.      Whether MyLife's conduct as described in this Complaint violates Ohio

22  common law prohibiting misappropriation of a name or likeness; and

23             g.      Whether Plaintiff Evans and Ohio Sub-Class Members are entitled to the

24  injunctive, declaratory monetary, and other relief requested in this Complaint.

25      133.    Plaintiffs' claims are typical of those of the proposed Nationwide Class and state

26  Sub-Classes. Plaintiffs and all members of the proposed Classes have been harmed by

27  MyLife's misappropriation and misuse of their identifies, names, likenesses, personas, and

28  other personal information in advertisements promoting www.mylife.com. MyLife presents its

advertisements in the same way for each Class member. The Nevada and Ohio Sub-Classes are comprised of members whose intellectual property and privacy rights are protected by the same state statutes and torts protecting the corresponding named Plaintiffs.

134.   The proposed class representatives will fairly and adequately represent the proposed Classes. Plaintiffs' claims are co-extensive with those of the rest of the Classes. Plaintiffs are represented by qualified counsel experienced in class action litigation of this nature.

135.   A class action is superior to other available methods for the fair and efficient adjudication of these claims because individual joinder of the claims of all members of the proposed Classes is impracticable. Many members of the Classes do not have the financial resources necessary to pursue this claim, and even if they did, the size of their interest in the case may not be large enough to merit the cost of pursuing the case. Individual litigation of these claims would be unduly burdensome on the courts in which individualized cases would proceed. Individual litigation would greatly increase the time and expense needed to resolve a dispute concerning MyLife's common actions towards an entire group. Class action procedures allow for the benefits of unitary adjudication, economy of scale, and comprehensive supervision of the controversy by a single court.

136.   The proposed class action may be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. MyLife has acted on grounds generally applicable to the proposed Classes, such that final injunctive and declaratory relief is appropriate with respect to the Classes as a whole.

137.   The proposed class action may be certified pursuant to Rule 23(b)(3). Questions of law and fact common to Class Members predominate over questions affecting individual members, and a class action is superior to other available methods for fairly and efficiency adjudicating the controversy.

## FIRST CAUSE OF ACTION
### Violation of California Right of Publicity Statute, Cal. Civ. Code § 3344
### (Plaintiffs on behalf of the Nationwide Class)

138.   Plaintiffs incorporate by reference the allegations contained in all preceding

paragraphs of this Complaint.

139. California's right of publicity statute prohibits the "knowing[] use[] of another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent." Cal. Civ. Code § 3344.

140. By engaging in the foregoing acts and omissions, MyLife used Plaintiffs' and Nationwide Class Members' names, likenesses, photographs, and personas for commercial purposes without consent. Plaintiffs and Nationwide Class Members' names and personas have commercial value as demonstrated by MyLife's use and similar use by MyLife's competitors.

141. MyLife is a California company. Most of the wrongful acts and omissions giving rise to this complaint occurred in California. Accordingly, each use of a Nationwide Class Member's name, likeness, or persona in a MyLife advertisement violates Cal. Civ. Code § 3344, wherever the Class Member resides in the United States.

142. Each use of a Nationwide Class Members' name and personal information in a teaser profile or full profile is a separate and distinct violation of Cal. Civ. Code § 3344.

143. Cal. Civ. Code § 3344 provides that a person who violates the statute is liable "in an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages," in addition to "any profits from the unauthorized use." The statute also provides for "[p]unitive damages" and "attorney's fees and costs."

144. As a result of MyLife's violation of Cal. Civ. Code § 3344, Plaintiffs and Nationwide Class Members have suffered injury to their privacy rights and actual damages both economic and emotional. Plaintiffs and Nationwide Class Members have been denied the economic value of their names, likenesses, and personas, which MyLife misappropriated without compensation to Plaintiffs and Nationwide Class Members. Plaintiffs and Nationwide Class Members were denied their statutorily protected right to refuse consent and protect their privacy and the economic value of their names, likenesses, and personas. Plaintiffs and Nationwide Class Members suffered emotional disturbance from the misappropriation and misuse of their names and personal information.

145.    Plaintiffs on behalf of the Nationwide Class seek actual damages, including MyLife's profits from its misuse; statutory damages; compensatory damages for the royalties MyLife failed to pay; restitution; punitive damages; nominal damages; the award of attorneys' fees and costs; the entry of an injunction prohibiting MyLife's illegal conduct; and declaratory relief.

### SECOND CAUSE OF ACTION
### California Tort of Appropriation of a Name or Likeness
### (Plaintiffs on behalf of the Nationwide Class)

146.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

147.    California common law recognizes the tort of "appropriation, for the defendant's advantage, of the plaintiff's name or likeness." *Eastwood v. Superior Court*, 149 Cal.App.3d 409, 416 (Cal. Ct. App. 1983).

148.    MyLife is a California company. Most of the wrongful acts and omissions giving rise to this complaint occurred in California. Accordingly, each use of a Nationwide Class Member's name, likeness, or persona in a MyLife advertisement violates California common law, wherever the Class Member resides in the United States.

149.    By engaging in the forgoing acts and omissions, MyLife (1) used the identities of Plaintiffs and Nationwide Class Members in advertisements for subscriptions and as part of its subscription products; (2) appropriated Plaintiffs' and Nationwide Class Members' names and likenesses to MyLife's commercial advantage; (3) failed to obtain Plaintiffs' and Nationwide Class Members' consent; and (4) injured Plaintiffs' and Nationwide Class Members by causing harms both economic and emotional. *See Eastwood,* at 417.

150.    On behalf of the Nationwide Class, Plaintiffs seek monetary recovery in the amount of the commercial advantage MyLife derived from its misuse; compensatory damages for MyLife's failure to pay royalties owed; and the entry of an injunction prohibiting MyLife's tortious acts.

## THIRD CAUSE OF ACTION
### Nevada Right of Publicity Statute, Nev. Rev. Stat. §§ 597.770 *et seq.*
### (Plaintiff Bockius on behalf of the Nevada Sub-Class)

151.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

152.    Nevada's right of publicity statute recognizes that "[t]here is a right of publicity in the name, voice, signature, photograph or likeness of every person." Nev. Rev. Stat. § 597.790.

153.    Nevada's right of publicity statute prohibits "[a]ny commercial use of the name, voice, signature, photograph or likeness of another by a person, firm or corporation without first having obtained written consent." Nev. Rev. Stat. § 597.810.

154.    By engaging in the forgoing acts and omissions, MyLife used Plaintiff Blockius' and Nevada Sub-Class Members' personalities, including their names, photographs, images, likenesses, and distinctive appearances, for commercial purposes without consent.

155.    Each use of a Nevada Sub-Class Members' name, photograph, or personality is a separate and distinct violation of Nev. Rev. Stat. § 597.810.

156.    Nev. Rev. Stat. § 597.810 provides that a person who violates the statute is liable for "[a]ctual damages, but not less than $750" and "Exemplary or punitive damages" if the defendant's use was knowing. A plaintiff is also entitled to "injunctive relief to prevent or restrain the unauthorized use."

157.    Because of MyLife's violation of Nev. Rev. Stat. § 597.810, Plaintiff Bockius and Nevada Sub-Class Members have suffered injury to their privacy rights and actual damages both economic and emotional. Plaintiff Bockius and Nevada Sub-Class Members have been denied the economic value of their personalities, which MyLife misappropriated without compensation to Plaintiff Bockius and Nevada Sub-Class Members. Plaintiff Bockius and Nevada Sub-Class Members were denied their statutorily protected right to refuse consent and protect their privacy. Plaintiff Bockius and Nevada Sub-Class Members suffered emotional disturbance from the misappropriation and misuse of their personalities.

158.    On behalf of the Nevada Sub-Class, Plaintiff Bockius seeks actual damages,

including MyLife's profits from its misuse; statutory damages; compensatory damages for the royalties MyLife failed to pay; exemplary and punitive damages in light of MyLife's knowing misuse; nominal damages; the award of attorneys' fees and costs; the entry of an injunction prohibiting MyLife's illegal conduct; and declaratory relief.

### FOURTH CAUSE OF ACTION
### Ohio Right of Publicity Statute, Ohio Rev. Code § 2741
### (Plaintiff Evans on behalf of the Ohio Sub-Class)

159.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

160.    Ohio's right of publicity statute prohibits the use of "any aspect of an individual's persona for a commercial purpose" unless the person "first obtains the written consent" of the individual. Ohio Rev. Code § 2741.02 & § 2741.05.

161.    By engaging in the forgoing acts and omissions, MyLife used aspects of Plaintiff Evans' and Ohio Sub-Class Members' personalities, including their names, photographs, images, likenesses, and distinctive appearances, for a commercial purpose without consent. These aspects of Plaintiff Evans' and Ohio Sub-Class Members' personalities have commercial value, as evidenced by MyLife's use and similar use by other companies.

162.    Each use of an Ohio Sub-Class Members' personality is a separate and distinct violation of Ohio Rev. Code § 2741.02.

163.    Plaintiff Evans and Ohio Sub-Class Members are residents of the state of Ohio. *See* Ohio Rev. Code § 2741.03.

164.    Ohio Rev. Code § 2741.07 provides that a person who violates the statute is liable for (1) "[a]ctual damages, including any profits derived from and attributable to the unauthorized use"; (2) "[a]t the election of the plaintiff and in lieu of actual damages, statutory damages in the amount of at least two thousand five hundred dollars and not more than ten thousand dollars"; and (3) "punitive or exemplary damages" if applicable under Ohio Rev. Code § 2315.21. The statute provides that "[t]he trier of fact shall include any profits derived . . in calculating the award of actual damages." Ohio Rev. Code § 3741.07.

165.    Because of MyLife's violation of Ohio Rev. Code § 2741, Plaintiff Evans and

Ohio Sub-Class Members have suffered injury to their privacy and intellectual property rights, and actual damages both economic and emotional, including actual damages in the amount of the profits MyLife derived from its unauthorized use. Plaintiff Evans and Ohio Sub-Class Members have been denied the economic value of their personas, which MyLife appropriated without compensation. Plaintiff Evans and Ohio Sub-Class Members were denied their statutorily protected right to refuse consent and protect their privacy. Plaintiff Evans and Ohio Sub-Class Members suffered emotional disturbance from the appropriation and misuse of their personas.

166.    On behalf of the Ohio Sub-Class, Plaintiff Evans seeks statutory damages; actual damages, including MyLife's profits from its misuse; compensatory damages for royalties MyLife failed to pay; restitution, punitive and exemplary damages; the award of attorneys' fees and costs; an injunction prohibiting MyLife's unauthorized use; and declaratory relief. Plaintiff Evans intends to elect between actual and statutory damages at a later stage of the lawsuit, after discovery has revealed the amount of MyLife's profits.

## FIFTH CAUSE OF ACTION
### Ohio Tort of Appropriation of a Name or Likeness
### (Plaintiff Evans on behalf of the Ohio Sub-Class)

167.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

168.    Ohio common law recognizes the tort of appropriation of a name or likeness. The tort creates a cause of action for the appropriation of a likeness by a defendant for the defendant's "own use or benefit." *See, e.g.*, *Zacchini v. Scripps-Howard Broadcasting Co.*, 47 Ohio St. 2d 224, 231 n. 4 (Ohio 1976) (quotation omitted).

169.    By engaging in the forgoing acts and omissions, MyLife appropriated Plaintiff Evans' and Ohio Sub-Class Members' names and likenesses for its own commercial benefit.

170.    As provided for under Ohio common law, on behalf of the Ohio Sub-Class, Plaintiff Evans seeks monetary recovery in the amount of the commercial benefit MyLife derived from its misuse of their likeness, as well as the entry of an injunction prohibiting MyLife's tortious acts.

## SIXTH CAUSE OF ACTION
### California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*
### (Plaintiffs on behalf of the Nationwide Class)

171.   Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

172.   MyLife has and is engaged in unfair competition, as that term is defined in the California Unfair Competition Law, Cal. Bus. & Prof. Code. § 17200 et seq. ("UCL").

173.   As described in this complaint, MyLife's misappropriation and use without consent of Plaintiffs' and Nationwide Class Members' names, photographs, likenesses, and personal information is a violation of California's Right of Publicity statute, Cal. Civ. Code § 3344; Nevada's Right of Publicity statute, Nev. Rev. Stat. § 597.810; Ohio's Right of Publicity statute, Ohio Rev. Code § 2741; and California and Ohio common law prohibiting misappropriation of a name or likeness.

174.   By engaging in the conduct described in this complaint and violating California, Nevada, and Ohio law, MyLife engaged in and continues to engage in "unlawful" business acts and practices prohibited by the UCL.

175.   By engaging in the conduct described in this complaint, including profiting from the sale and use in advertising of personal information it misappropriated without consent, MyLife engaged in and continues to engage in "unfair" business acts and practices prohibited by the UCL.

176.   As a result of MyLife's actions, Plaintiffs and Nationwide Class Members have been injured. Plaintiffs and Nationwide Class Members lost the economic value of their names, personas, and likenesses, and are entitled to restitution, declaratory relief and an injunction. Plaintiffs and Nationwide Class Members were denied their rights to refuse consent and protect their privacy.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, individually and on behalf of the Nationwide Class and state Sub-Classes, request the following relief:

(a)   For an order certifying the proposed Classes and appointing Plaintiffs

and their counsel to represent the Classes;

(b)     For a declaration that MyLife's acts and omissions constitute a knowing and willful misappropriation of names, likeness, personas, and personalities, and infringe on protected privacy and intellectual property rights, in violation of California, Nevada, and Ohio statutes and common law;

(c)     For nominal damages awarded in recognition of MyLife's violation of the statutorily protected property and privacy rights of Plaintiffs and Class Members;

(d)     For preliminary and permanent injunctive relief enjoining and preventing MyLife from continuing to operate its www.mylife.com website without appropriate safeguards to ensure people's personal information is not used illegally without their consent;

(e)     For restitution to Plaintiffs and Class Members of the money MyLife unjustly earned through sales made by misappropriating their names, likenesses, personas, and personalities;

(f)     For an award of damages, including without limitation: damages for actual harm; profits earned by MyLife; reasonable royalties for the infringement of Plaintiffs' and Class Members' intellectual property rights; and statutory damages;

(g)     For an award of reasonable attorneys' fees and costs incurred by Plaintiffs and Class Members; and

(h)     Orders granting such other and further relief as the Court deems necessary, just, and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial for all individual and Class claims so triable.

Respectfully submitted,

Dated: December 3, 2021              By:    /s/ Michael F. Ram
                                              Michael F. Ram

                                     Michael F. Ram (SBN 104805)
                                     mram@forthepeople.com
                                     Marie N. Appel (SBN 187483)
                                     mappel@forthepeople.com
                                     MORGAN & MORGAN
                                     COMPLEX LITIGATION GROUP
                                     711 Van Ness Avenue, Suite 500
                                     San Francisco, CA 94102
                                     Telephone: (415) 358-6913
                                     Facsimile: (415) 358-6923

                                     Benjamin R. Osborn (to be admitted *Pro Hac
                                     Vice*)
                                     102 Bergen St.
                                     Brooklyn, NY 11201
                                     Telephone: (347) 645-0464
                                     Email: ben@benosbornlaw.com

                                     Sam Strauss (to be admitted *Pro Hac Vice*)
                                     sam@turkestrauss.com
                                     Raina Borrelli (to be admitted *Pro Hac Vice*)
                                     raina@turkestrauss.com
                                     TURKE & STRAUSS LLP
                                     613 Williamson St., Suite 201
                                     Madison, Wisconsin 53703-3515
                                     Telephone: (608) 237-1775
                                     Facsimile: (509) 4423

                                     *Attorneys for Plaintiffs and the Proposed
                                     Classes*