# Exhibit 4

# RASKIN GORHAM ANDERSON LAW

11333 Iowa Ave. · Los Angeles, CA 90025                     310.202.5544 (o) · 310.202.5540 (f)

November 26, 2021

Via U.S. Mail and Email (raina@turkestrauss.com)

Raina Borrelli
TURKE & STRAUSS LLP
613 Williamson Street, Suite 201
Madison, WI 53703-3515

       Re:    *James Uharriet v. MyLife.com, Inc.*
              USDC Case No. 3:21-cv-08229

Dear Raina,

This letter follows on our discussion Tuesday, which also included several other counsel, and addresses issues raised in the Complaint in this action. We write to further meet and confer on a potential motion to compel arbitration, or alternatively to stay or dismiss based on the home state exception to CAFA and the Colorado River Doctrine.

## 1.    Mr. Uharriet's Individual Claim Must Be Resolved Through Arbitration.

MyLife's records show that Mr. Uharriet visited the "Join for Free Access to MyLife" page on MyLife's site, entered his name, city, state and date of birth, along with an email address, then clicked "Join For Free". Only when a user clicks the "Join For Free" button does MyLife harvest the data and show the user as a registered user. Below the button it conspicuously states that "By clicking on the button above, you agree to . . . MyLife's User Agreement and Privacy Policy." The phrases "User Agreement" and "Privacy Policy" were called out in different colored type, and complete versions of the User Agreement and Privacy Policy were hyperlinked. I sent you an exemplar of the page via email on Wednesday.

Mr. Uharriet was provided the opportunity to click on the links and review the Terms before he registered as a MyLife member. By clicking the button to submit his registration form, Mr. Uharriet confirmed that he had accepted the terms of the User Agreement as a condition of accessing the benefits of his MyLife subscription.

The Arbitration Agreement that encompasses Mr. Uharriet's claims in this action is set out in bold within the Terms and reads, in pertinent part, as follows:

    7.    ARBITRATION: These Terms require that disputes between MyLife and you be resolved by binding arbitration rather than by jury trials or class actions. MyLife.com® and you (such references include our respective subsidiaries, affiliates, predecessors in interest, successors and assigns) agree to

RASKIN GORHAM ANDERSON LAW

Raina Borrelli
November 26, 2021
Page 2

arbitrate all disputes and claims arising out of or relating to this Agreement between MyLife.com® and you.

A party who intends to seek arbitration must first send written notice to MyLife's Customer Care Center of its intent to arbitrate ("Notice"). The Notice to MyLife should be sent by any of the following means: (a) electronic message and completing the form; (b) electronic mail to arbitration@mylife.com; or (c) sending the Notice by U.S. Postal Service certified mail to MyLife.com®, Attn: Customer Relations, 907 Westwood Blvd., Suite 359, Los Angeles, CA 90024. The Notice must also describe the nature and basis of the claim or dispute; and set forth the specific relief sought. If we do not reach an agreement to resolve the claim within thirty (30) days after the Notice is received, you or MyLife may commence an arbitration proceeding.

The arbitration shall be governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Agreement, and shall be administered by the AAA. All issues are for the arbitrator to decide, including the scope of this arbitration clause, but the arbitrator is bound by the terms of this Agreement. A judgment upon the award entered by the arbitrator may be entered in any court having jurisdiction thereof.

Except as otherwise provided for herein, MyLife.com® will pay all AAA filing, administration and arbitrator fees. If, however, the arbitrator finds that either the substance of your claim or the relief sought is improper or not warranted, as measured by the standards set forth in Federal Rule of Civil Procedure 11(b), then the payment of all such fees shall be governed by the AAA Rules. In such case, you agree to reimburse MyLife.com® for all monies previously disbursed by it that are otherwise your obligation to pay under the AAA Rules. If the arbitrator grants relief to you that is equal to or greater than the value of your Demand, MyLife.com® shall reimburse you for your reasonable attorneys' fees and expenses incurred for the arbitration.

You agree that, by entering into this Agreement, you and MyLife.com® are waiving the right to a trial by jury. The arbitrator may award injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. You and MyLife.com® agree that YOU AND MYLIFE.COM® MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, and not as a plaintiff or class member in any purported class or representative proceeding. Further, you agree that the arbitrator may not consolidate proceedings or more than one person's claims and may not otherwise

# Raskin Gorham Anderson Law

Raina Borrelli
November 26, 2021
Page 3

> preside over any form of a representative or class proceeding, and that if this specific proviso is found to be unenforceable, then the entirety of this arbitration clause shall be null and void.

This arbitration provision applies to "all disputes and claims arising out of or relating to this Agreement between MyLife.com® and you."   Mr. Uharriet also expressly waived a right to trial by jury (which he requests in his Complaint) and agreed that he would pursue any claims against MyLife on an individual basis, rather than as a class representative.

The Federal Arbitration Act ("FAA") broadly applies to any written arbitration agreement in a contract involving, directly or indirectly, interstate commerce. *See, e.g.*, *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995); *see also* 9 U.S.C. §§ 1-2. Section 2 of the FAA mandates that binding arbitration provisions in contracts "evidencing a transaction involving [interstate] commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) ("Section 2 [of the FAA] embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts."); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) ("Section 2 [of the FAA] makes arbitration agreements 'valid, irrevocable, and enforceable' as written . . . ."). The Supreme Court has repeatedly recognized the FAA is extremely broad and applies to any transaction directly or indirectly affecting interstate commerce. *See, e.g., Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401 (1967).

The FAA promotes a "liberal federal policy favoring arbitration agreements," and "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *see also Perry v. Thomas*, 482 U.S. 483, 490-91 (1987) (arbitration agreements falling within scope of FAA "must be 'rigorously enforce[d]'" (citations omitted)); *AT&T Mobility LLC*, 563 U.S. at 339, 345–46. In fact, the Supreme Court has confirmed that the "'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" *AT&T Mobility LLC*, 563 U.S. at 344. The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

By consenting to bilateral arbitration, the "parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*, 559 U.S. 662, 685 (2010) (citations omitted). Thus, "parties may agree to limit the issues subject to arbitration [citation], to arbitrate according to specific rules [citation], and to limit with whom a party will arbitrate its disputes [citation]." *AT&T Mobility LLC*, 563 U.S. at 344 (citations omitted). Ultimately, "[i]t falls to courts and arbitrators to give effect to these contractual limitations, and when doing so,

Raskin Gorham Anderson Law

Raina Borrelli
November 26, 2021
Page 4

courts and arbitrators must not lose sight of the purpose of the exercise: to give effect to the intent of the parties." *Stolt-Nielsen S.A.*, 559 U.S. at 684.

An arbitration provision governed by the FAA is presumed to be valid and enforceable. *See Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-27 (1985); *Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984). Here, Plaintiff bears the burden of showing the arbitration provision is invalid or does not encompass the claims at issue. *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000); *Caban v. J.P. Morgan Chase & Co.*, 606 F. Supp. 2d 1361, 1364 (S.D. Fla. 2009). Plaintiff cannot contend that the Agreement, which includes the arbitration provision, was ineffective or invalid, and even if he did, the Arbitration Provision delegates that issue, and all others, to the arbitrator. ("All issues are for the arbitrator to decide, including the scope of this arbitration clause. . . .").

"[G]eneralized attacks on arbitration," *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991), based on the "suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants," *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 481 (1989), have been repudiated as "far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes." *Id.* at 481. It is against this backdrop of the strong federal policy of encouraging arbitration that the Court must evaluate the merits of a motion to compel arbitration.

An arbitration agreement is specifically enforceable under the FAA if the following requirements are met: (1) the existence of a written agreement to arbitrate claims, (2) a nexus to interstate commerce, and (3) coverage of the claims by the arbitration clause. 9 U.S.C. § 2. Each of these elements is clearly satisfied in this case.

The first requirement is met because the User Agreement accepted by Mr. Uharriet contained a written arbitration agreement. *See* 9 U.S.C. § 2; *see also Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005) (discussing the "in writing" requirement of the FAA).

The second FAA requirement is also satisfied because the claims at issue clearly involved and affected interstate commerce. This requirement is interpreted expansively: "The broad authority of Congress under the Commerce Clause has, of course, long been interpreted to extend beyond activities actually *in* interstate commerce to reach other activities, while wholly local in nature, nevertheless substantially *affect* interstate commerce." *McClain v. Real Estate Bd. of New Orleans*, 444 U.S. 232, 241-42 (1980) (emphasis in original).

Through its website MyLife provides services that allow individuals to understand and manage the information that is available in the public domain about them. The information is organized into a profile, some of which can be viewed for free by anyone who conducts a "name search" on MyLife's website. Courts regularly hold that similar activities constitute

RASKIN GORHAM ANDERSON LAW

Raina Borrelli
November 26, 2021
Page 5

interstate commerce. *See, e.g.*, *U.S. v. Sutcliffe*, 505 F.3d 944, 952 (9th Cir. 2007) ("[I]t seems clear that use of the internet is intimately related to interstate commerce."); *Nat'l Grange of the Order of Patrons of Husbandry v. Cal. State Grange*, No. 2:16-201 WBS DB, 2016 WL 6696061, at *4 (E.D. Cal. Nov. 15, 2016) ("Because defendants' representations are available on public websites and allegedly damaging the [plaintiff's] reputation, they are made in interstate commerce."); *Netlist, Inc. v. Diablo Techs., Inc.*, No. 13–cv–5962 YGR, 2015 WL 5138634, at *3 (N.D. Cal. Sept. 1, 2015) ("[T]he Internet 'is an instrumentality and channel of interstate commerce' and 'use of the internet is intimately related to interstate commerce.'") (quoting *Sutcliffe*, 505 F.3d at 952, 953); *Out of the Box Enters., LLC v. El Paseo Jewelry Exchange*, No. EDCV 10–01858 VAP(OPx), 2011 WL 13135643, at *4 (C.D. Cal. Feb. 24, 2011) ("A website, transmitted worldwide over the Internet, falls within the scope of commerce lawfully regulated by Congress because the Internet has been deemed an 'instrumentality and channel of interstate commerce.'") (quoting *Sutcliffe*, 505 F.3d at 953).

The third requirement also is met, as the arbitration provision broadly encompasses all disputes, however this is a matter expressly reserved for the arbitrator's determination.  Where an arbitration agreement contains a delegation provision that vests in an arbitrator the authority to determine the validity and enforceability of the arbitration agreement, those threshold issues must be compelled to arbitration.  *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67-71 (2010).  When parties agree to arbitrate all disputes arising under their contract, questions concerning the validity of the entire contract are to be resolved by the arbitrator in the first instance, not by a federal or state court.  *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). In *Rent-A-Center*, the United States Supreme Court acknowledged the right of parties to include delegation clauses in arbitration agreements, whereby they "agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center*, 561 U.S. at 68-69 (citing *Howsam*, 537 U.S. at 83-85).  To be enforceable, such delegation clauses are subject to a heightened standard, *i.e.*, the parties' intent to arbitrate the issue of arbitrability must be demonstrated by "clear and unmistakable evidence."  *Id.* at 79; *see First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citation omitted).  Unless a party specifically and discretely challenges a clear and unmistakable delegation of authority to the arbitrator, any challenge to the validity or enforceability of the entire arbitration agreement is subject to arbitration and must be left for the arbitrator to resolve.  *Rent-A-Center*, 561 U.S. at 70-71.

It is *clear* and *unmistakable* that the Arbitration Agreement delegates the gateway determinations of arbitrability of Plaintiff's claims, as well as questions of the arbitrability, interpretation and scope of the Arbitration Agreement, to the arbitrator.  The User Agreement clearly and unmistakably indicates that "MyLife.com® and [Plaintiff] . . . agree to arbitrate all disputes and claims arising out of or relating to this Agreement between MyLife.com® and [Plaintiff] . . . [a]ll issues are for the arbitrator to decide, including the scope of this arbitration clause."  This is a typical broad delegation provision concerning the threshold issue of arbitrability, and according to the overwhelming authority, the Court must compel arbitration of

Raskin Gorham Anderson Law

Raina Borrelli
November 26, 2021
Page 6

Mr. Uharriet's claims without addressing the merits of the Mr. Uharriet's potential challenges to arbitrability or the validity or enforceability of the agreement to arbitrate.

**2.**   **The Court Must Abstain From Exercising Jurisdiction Pursuant to the Home State Exception.**

Mr. Uharriet's legal claims both arise under California law.  He asserts federal jurisdiction based on the Class Action Fairness Act ("CAFA").  Mr. Uharriet seeks a putative class of "[a]ll California residents who are not subscribers of mylife.com and whose names and personal information MyLife incorporated in teaser profiles used to promote its products." (Complaint, ECF 1, at 20-21, ¶ 49 (emphasis added).)  In estimated the size of the class, Mr. Uharriet emphasizes that the class is "equal or close to the entire population of California." (*Id.*, at 5, ¶ 19.)

"Congress enacted CAFA in 2005 to 'curb perceived abuses of the class action device which, in the view of CAFA's proponents, had often been used to litigate multistate or even national class actions in state courts.'" *Corber v. Xanodyne Pharms., Inc.*, 771 F.3d 1218, 1222 (9th Cir. 2014) (en banc) (quoting *Tanoh v. Dow Chem. Co.*, 561 F.3d 945, 952 (9th Cir. 2009)). CAFA was envisioned as a mechanism to provide a fair, neutral forum for diverse parties. *Ehrman v. Cox Comms., Inc.*, 932 F.3d 1223, 1226 (9th Cir. 2019) "Thus, CAFA was intended to strongly favor federal jurisdiction over interstate class actions." *Adams v. West Marine Prods.*, 958 F.3d 1216, 1220-1221 (9th Cir. 2020) (affirming remand by Judge Chhabria of action in which most putative class members were residents of California (internal quotations and citation omitted).)

Congress provided exceptions to federal jurisdiction under CAFA, to allow truly intrastate class actions to be heard in state court. *See Bridewell-Sledge v. Blue Cross of Cal.*, 798 F.3d 923, 928 (9th Cir. 2015). Under the "mandatory home state exception", a district court "shall" decline to exercise jurisdiction when more than two-thirds of the putative class members are citizens of the state where the action was filed, the principal injuries occurred in that same state, and at least one significant defendant is a citizen of that state. 28 U.S.C. § 1332(d)(4)(A).  That exception applies here, as the Complaint confirms that all members of the putative class are residents of California. There is no basis for federal jurisdiction here.

Even if the mandatory home state exception did not apply, the district court has discretion to decline to exercise jurisdiction in the interests of justice and looking at the totality of the circumstances, when more than one-third of the putative class, and the primary defendants, are citizens of the state where the action was originally filed. 28 U.S.C. § 1332(d)(3). CAFA states six factors for a district court to consider in deciding whether to decline jurisdiction under this discretionary home state exception:  (1) whether the claims asserted involve matters of state or interstate interest; (2) whether the claims are governed by the laws of the state in which the action was filed; (3) whether the class action was pleaded in a manner designed to avoid federal jurisdiction, (4) whether the action was brough in a

RASKIN GORHAM ANDERSON LAW

Raina Borrelli
November 26, 2021
Page 7

jurisdiction with a nexus to the class members, (5) whether the number of members of the putative class within the state in which the action was filed is substantially larger than those from other states; and (6) whether pother lass actions were filed within the prior three years. 28 U.S.C. § 1332(d)(3)(A)-(F).

All of these factors fall heavily in favor of abstention.  Mr. Uharriet raises purely California claims and seeks certification of a class of exclusively California residents.  California has a nexus to the claims, and another, virtually identical class action has been pending in state court for one year (as discussed more fully below).

3.     **The Action Should Be Stayed or Dismissed Under the Colorado River Doctrine Because the Complaint Raises Issues Nearly Identical To Those At Issue In *Kaplan v. MyLife*.**

We sent you on Monday the complaint in *Leslie Kaplan, on behalf of herself and all others similarly situated, v. MyLife.com. Inc. and DOES 1 through 10, inclusive*, Superior Court for the State of California, County of Alameda Case No. RG20080867 ("the Kaplan Action").  The Kaplan Action was initiated by filing of a Class Action Complaint on November 17, 2020.  The plaintiff in the Kaplan Action, Ms. Kaplan, asserts claims under the California statutory right of publicity set forth in California Civil Code section 3344 and violation of the common law right of publicity, among other claims. Ms. Kaplan alleges that MyLife publicized private facts of Ms. Kaplan and intruded upon her privacy by misappropriating Ms. Kaplan's likeness for commercial purposes.  Ms. Kaplan asserts her claims for herself and on behalf of a putative class of all persons (with certain exclusions) with a street address in California about whom MyLife prepared a report identifying the subject of the report by at least a first and last name, and all persons with a street address in California about whom MyLife prepared a report identifying any income, net worth, ethnicity, or religion for the subject of the report.

The Court in the Kaplan Action already has ruled on motions addressing some of the substantial legal issues.  The Court overruled a demurrer to the 3344 claim, finding that the face of the complaint did not establish that MyLife fell within the public affairs exception of the statute, and did not establish that MyLife uses information for non-commercial uses.  Judge Seligman also ruled that the complaint in the Kaplan Action did not establish that MyLife discloses only information that is in the public record.  The parties have exchanged written discovery and documents, and the case is well underway.

This Action is a putative class action on behalf of all "California residents who are not subscribers of mylife.com and whose names and personal information MyLife incorporated in teaser profiles used to promote its products."  (Complaint, ECF 1, at 20-21, ¶ 49.)  Mr. Uharriet, for himself and the putative class, states two claims under state law, for Violation of California Right of Publicity Statute, California Civil Code section 3344, and the tort of Appropriation of Name and Likeness.

Raskin Gorham Anderson Law

Raina Borrelli
November 26, 2021
Page 8

It is manifest that the Kaplan Action and this Action are substantially similar, in that they assert the same legal violation against the same defendant on a state-wide basis.  It would seem wasteful in the extreme to clog two separate courts by asking them to resolve the same factual and legal issues, and the risks of inconsistent rulings is obvious. Since this Action was initiated about one year after the Kaplan Action was initiated, it seems like the best course here, in the event the case is not ordered to arbitration, is to have Mr. Uharriet dismiss his federal claims without prejudice.  If he wishes to file the same lawsuit filed by Ms. Kaplan, he can proceed in state court and seek to relate or consolidate his claims with the Kaplan Action, if appropriate. Of course, MyLife reserves its right to compel arbitration in any venue in which Mr. Uharriet asserts claims against MyLife.

In the absence of such an agreement, MyLife contemplates a motion to have the Court stay this Action and abstain from the exercise of jurisdiction in favor of the prior-filed parallel state court proceeding, because doing so would serve the interests of "[w]ise judicial administration, giving regard to the conservation of judicial resources and comprehensive disposition of litigation." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 818, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976); *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).   While the Colorado River doctrine admittedly is applied only in exceptional circumstances, its purpose is perfectly illustrated here, as Mr. Uharriet, according to his own allegations, is a member of the putative class in Kaplan.   While there may be minor differences in the description of the class between the Kaplan Action and this Action, "[e]xact parallelism" between the state and federal actions is not required; it is enough if the two actions are "substantially similar." *Nakash v. Marciano, 882 F.2d 1411, 1416 (9th Cir. 1989)* (quoted in *Krieger v. Atheros Communs., Inc.*, 776 F. Supp. 2d 1053, 1057 (N.D. Cal. 2011).)

The courts consider seven factors in assessing whether a stay is appropriate: (1) whether the state court first assumed jurisdiction over property; (2) inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings are inadequate to protect the federal litigant's rights; and (7) whether exercising jurisdiction would promote forum shopping.

Here, those factors weigh very heavily in favor or abstention.  The claims at issue here are exclusively state claims that are already being litigated in state court, and which were filed a year before this Action was initiated.  Litigating the same claims in federal court could lead to inconsistent rulings on matters of state law and will waste judicial resources that have literally never been more in need of conservation.  There is no indication that the Alameda Superior Court is an unfair forum to Mr. Uharriet, and in fact Judge Seligman overruled MyLife's demurrer.  Allowing Mr. Uharriet to pursue the same claims in federal court that Ms. Kaplan has pursued in state court for the past year also would promote forum shopping, as MyLife is dragged through two proceedings and the plaintiffs' counsel race to be first to certify a class.

RASKIN GORHAM ANDERSON LAW

Raina Borrelli
November 26, 2021
Page 9

MyLife reserves all rights to raise other defenses and to challenge the pleadings for non-jurisdictional reasons.

Best Regards,

/s

Gary J. Gorham

GJG:sm
cc:     Michael F. Ram        (MRam@forthepeople.com)
        Marie N. Appel        (MAppel@forthepeople.com)
        Benjamin R. Osborn    (Ben@benosbornlaw.com)
        Sam Strauss           (Sam@turkestrauss.com)
        Lucy H. Mekhael       (LMekhael@raskinlawllp.com)

# Turke & Strauss LLP

Raina C. Borrelli
raina@turkestrauss.com

November 29, 2021

*Via E-Mail*
Gary Gorham
ggorham@raskinlawllp.com

   **Re:**   **Uharriet v. MyLife.com, Inc., 3:21-cv-08229-VC**

Dear Gary,

I write in response to your letter dated November 26, 2021.

**First, with respect to arbitration:** Your letter claims that "Mr. Uharriet visited" various pages "on MyLife's site," input his personal information, and clicked the "Join For Free" button, thus assenting to MyLife's User Agreement. This is simply not accurate. We have confirmed with Mr. Uharriet that he has never visited any page on the website www.mylife.com, let alone affirmatively agreed to MyLife's User Agreement or Privacy Policy. This includes the pages described in your letter and the screenshot you shared by email. Mr. Uhariett is blind and has difficulty accessing the Internet.

Attorney Benjamin Osborn, who represents Mr. Uharriett, visited MyLife.com as part of his investigation into Mr. Uharriett's legal claim against MyLife.com, and to gather the screenshots shown in the complaint. Mr. Osborn performed his investigation as part of his duties under Rules 11 and 12 of the Federal Rules of Civil Procedure and in furtherance of Mr. Uhariett's First Amendment rights to petition for redress of grievances.

In the course of his investigation, Mr. Osborn saw a webpage that solicited his first name, last name, zip code, and email address. Mr. Osborn accurately entered this information. He did not enter Mr. Uharriet's information. Mr. Osborn kept a contemporaneous record of all the webpages he visited on MyLife.com to investigate Mr. Uharriett's claim and prepare the complaint. See the screenshot below, which was taken contemporaneously with Mr. Osborn accessing the webpage.



Please confirm with your client that its database captured all of the personal information in the screenshot above, including the first name "Benjamin", the last name "Osborn", and the zip code "11201" (which is a zip code in Brooklyn, NY where Mr. Osborn is located).

Given that Mr. Osborn accurately entered his personal information during his visit to the website, it is strange that your client nevertheless suggests that a "Mr. Uharriet" visited the website. Given this clarification of the facts, please confirm in writing that no arbitration argument will be raised.

**Second, with respect to CAFA jurisdiction and Colorado River Doctrine**: We intend to file an amended complaint, likely this week. While we do not agree with the claims in your letter with respect to either CAFA jurisdiction or the Colorado River doctrine, we expect our amended complaint will meaningfully change the analysis on both issues.

Very truly yours,

TURKE & STRAUSS LLP

Raina C. Borrelli

# RASKIN GORHAM ANDERSON LAW

11333 Iowa Ave. · Los Angeles, CA 90025                    310.202.5544 (o) · 310.202.5540 (f)

December 16, 2021

Via U.S. Mail and Email (raina@turkestrauss.com)

Raina Borrelli
TURKE & STRAUSS LLP
613 Williamson Street, Suite 201
Madison, WI 53703-3515

   Re: *James Uharriet v. MyLife.com, Inc.*
      USDC Case No. 3:21-cv-08229

Dear Raina,

This letter follows on our discussion yesterday. We write to further meet and confer on a potential motion to compel arbitration, or alternatively to dismiss.

  1. **Mr. Uharriet's Individual Claim Must Be Resolved Through Arbitration.**

We already have met and conferred regarding MyLife's potential motion to compel arbitration. Since Mr. Uharriet remains a plaintiff, we are obliged to seek this relief.

MyLife's records show that Mr. Uharriet visited the "Join for Free Access to MyLife" page on MyLife's site, entered his name, city, state and date of birth, along with an email address, then clicked "Join For Free". Only when a user clicks the "Join For Free" button does MyLife harvest the data and show the user as a registered user. Below the button it conspicuously states that "By clicking on the button above, you agree to . . . MyLife's User Agreement and Privac Policy." The phrases "User Agreement" and "Privacy Policy" were called out in different colored type, and complete versions of the User Agreement and Privacy Policy were hyperlinked. I sent you an exemplar of the page via email on Wednesday.

Mr. Uharriet was provided the opportunity to click on the links and review the Terms before he registered as a MyLife member. By clicking the button to submit his registration form, Mr. Uharriet confirmed that he had accepted the terms of the User Agreement as a condition of accessing the benefits of his MyLife subscription.

The Arbitration Agreement that encompasses Mr. Uharriet's claims in this action is set out in bold within the Terms and reads, in pertinent part, as follows:

# RASKIN GORHAM ANDERSON LAW

Raina Borrelli
December 16, 2021
Page 2

7. ARBITRATION: These Terms require that disputes between MyLife and you be resolved by binding arbitration rather than by jury trials or class actions. MyLife.com® and you (such references include our respective subsidiaries, affiliates, predecessors in interest, successors and assigns) agree to arbitrate all disputes and claims arising out of or relating to this Agreement between MyLife.com® and you.

A party who intends to seek arbitration must first send written notice to MyLife's Customer Care Center of its intent to arbitrate ("Notice"). The Notice to MyLife should be sent by any of the following means: (a) electronic message and completing the form; (b) electronic mail to arbitration@mylife.com; or (c) sending the Notice by U.S. Postal Service certified mail to MyLife.com®, Attn: Customer Relations, 907 Westwood Blvd., Suite 359, Los Angeles, CA 90024. The Notice must also describe the nature and basis of the claim or dispute; and set forth the specific relief sought. If we do not reach an agreement to resolve the claim within thirty (30) days after the Notice is received, you or MyLife may commence an arbitration proceeding.

The arbitration shall be governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Agreement, and shall be administered by the AAA. All issues are for the arbitrator to decide, including the scope of this arbitration clause, but the arbitrator is bound by the terms of this Agreement. A judgment upon the award entered by the arbitrator may be entered in any court having jurisdiction thereof.

Except as otherwise provided for herein, MyLife.com® will pay all AAA filing, administration and arbitrator fees. If, however, the arbitrator finds that either the substance of your claim or the relief sought is improper or not warranted, as measured by the standards set forth in Federal Rule of Civil Procedure 11(b), then the payment of all such fees shall be governed by the AAA Rules. In such case, you agree to reimburse MyLife.com® for all monies previously disbursed by it that are otherwise your obligation to pay under the AAA Rules. If the arbitrator grants relief to you that is equal to or greater than the value of your Demand, MyLife.com® shall reimburse you for your reasonable attorneys' fees and expenses incurred for the arbitration.

You agree that, by entering into this Agreement, you and MyLife.com® are waiving the right to a trial by jury. The arbitrator may award injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. You and MyLife.com® agree that YOU AND MYLIFE.COM® MAY BRING CLAIMS

RASKIN GORHAM ANDERSON LAW

Raina Borrelli
December 16, 2021
Page 3

> AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL
> CAPACITY, and not as a plaintiff or class member in any purported class or
> representative proceeding. Further, you agree that the arbitrator may not
> consolidate proceedings or more than one person's claims and may not otherwise
> preside over any form of a representative or class proceeding, and that if this
> specific proviso is found to be unenforceable, then the entirety of this arbitration
> clause shall be null and void.

This arbitration provision applies to "all disputes and claims arising out of or relating to this Agreement between MyLife.com® and you." Mr. Uharriet also expressly waived a right to trial by jury (which he requests in his Complaint) and agreed that he would pursue any claims against MyLife on an individual basis, rather than as a class representative.

The Federal Arbitration Act ("FAA") broadly applies to any written arbitration agreement in a contract involving, directly or indirectly, interstate commerce. *See, e.g.*, *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995); *see also* 9 U.S.C. §§ 1-2. Section 2 of the FAA mandates that binding arbitration provisions in contracts "evidencing a transaction involving [interstate] commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) ("Section 2 [of the FAA] embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts."); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) ("Section 2 [of the FAA] makes arbitration agreements 'valid, irrevocable, and enforceable' as written . . . ."). The Supreme Court has repeatedly recognized the FAA is extremely broad and applies to any transaction directly or indirectly affecting interstate commerce. *See, e.g., Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401 (1967).

The FAA promotes a "liberal federal policy favoring arbitration agreements," and "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *see also Perry v. Thomas*, 482 U.S. 483, 490-91 (1987) (arbitration agreements falling within scope of FAA "must be 'rigorously enforce[d]'" (citations omitted)); *AT&T Mobility LLC*, 563 U.S. at 339, 345–46. In fact, the Supreme Court has confirmed that the "'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" *AT&T Mobility LLC*, 563 U.S. at 344. The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

By consenting to bilateral arbitration, the "parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*, 559 U.S. 662, 685 (2010)

RASKIN GORHAM ANDERSON LAW

Raina Borrelli
December 16, 2021
Page 4

(citations omitted). Thus, "parties may agree to limit the issues subject to arbitration [citation], to arbitrate according to specific rules [citation], and to limit with whom a party will arbitrate its disputes [citation]." *AT&T Mobility LLC*, 563 U.S. at 344 (citations omitted). Ultimately, "[i]t falls to courts and arbitrators to give effect to these contractual limitations, and when doing so, courts and arbitrators must not lose sight of the purpose of the exercise: to give effect to the intent of the parties." *Stolt-Nielsen S.A.*, 559 U.S. at 684.

An arbitration provision governed by the FAA is presumed to be valid and enforceable. *See Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-27 (1985); *Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984). Here, Plaintiff bears the burden of showing the arbitration provision is invalid or does not encompass the claims at issue. *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000); *Caban v. J.P. Morgan Chase & Co.*, 606 F. Supp. 2d 1361, 1364 (S.D. Fla. 2009). Plaintiff cannot contend that the Agreement, which includes the arbitration provision, was ineffective or invalid, and even if he did, the Arbitration Provision delegates that issue, and all others, to the arbitrator. ("All issues are for the arbitrator to decide, including the scope of this arbitration clause. . . .").

"[G]eneralized attacks on arbitration," *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991), based on the "suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants," *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 481 (1989), have been repudiated as "far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes." *Id.* at 481. It is against this backdrop of the strong federal policy of encouraging arbitration that the Court must evaluate the merits of a motion to compel arbitration.

An arbitration agreement is specifically enforceable under the FAA if the following requirements are met: (1) the existence of a written agreement to arbitrate claims, (2) a nexus to interstate commerce, and (3) coverage of the claims by the arbitration clause. 9 U.S.C. § 2. Each of these elements is clearly satisfied in this case.

The first requirement is met because the User Agreement accepted by Mr. Uharriet contained a written arbitration agreement. *See* 9 U.S.C. § 2; *see also Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005) (discussing the "in writing" requirement of the FAA).

The second FAA requirement is also satisfied because the claims at issue clearly involve and affect interstate commerce. This requirement is interpreted expansively: "The broad authority of Congress under the Commerce Clause has, of course, long been interpreted to extend beyond activities actually *in* interstate commerce to reach other activities, while wholly local in nature, nevertheless substantially *affect* interstate commerce." *McClain v. Real Estate Bd. of New Orleans*, 444 U.S. 232, 241-42 (1980) (emphasis in original).

RASKIN GORHAM ANDERSON LAW

Raina Borrelli
December 16, 2021
Page 5

Through its website MyLife provides services that allow individuals to understand and manage the information that is available in the public domain about them. The information is organized into a profile, some of which can be viewed for free by anyone who conducts a "name search" on MyLife's website. Courts regularly hold that similar activities constitute interstate commerce. *See, e.g.*, *U.S. v. Sutcliffe*, 505 F.3d 944, 952 (9th Cir. 2007) ("[I]t seems clear that use of the internet is intimately related to interstate commerce."); *Nat'l Grange of the Order of Patrons of Husbandry v. Cal. State Grange*, No. 2:16-201 WBS DB, 2016 WL 6696061, at *4 (E.D. Cal. Nov. 15, 2016) ("Because defendants' representations are available on public websites and allegedly damaging the [plaintiff's] reputation, they are made in interstate commerce."); *Netlist, Inc. v. Diablo Techs., Inc.*, No. 13–cv–5962 YGR, 2015 WL 5138634, at *3 (N.D. Cal. Sept. 1, 2015) ("[T]he Internet 'is an instrumentality and channel of interstate commerce' and 'use of the internet is intimately related to interstate commerce.'") (quoting *Sutcliffe*, 505 F.3d at 952, 953); *Out of the Box Enters., LLC v. El Paseo Jewelry Exchange*, No. EDCV 10–01858 VAP(OPx), 2011 WL 13135643, at *4 (C.D. Cal. Feb. 24, 2011) ("A website, transmitted worldwide over the Internet, falls within the scope of commerce lawfully regulated by Congress because the Internet has been deemed an 'instrumentality and channel of interstate commerce.'") (quoting *Sutcliffe*, 505 F.3d at 953).

The third requirement also is met, as the arbitration provision broadly encompasses all disputes, however this is a matter expressly reserved for the arbitrator's determination. Where an arbitration agreement contains a delegation provision that vests in an arbitrator the authority to determine the validity and enforceability of the arbitration agreement, those threshold issues must be compelled to arbitration. *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67-71 (2010). When parties agree to arbitrate all disputes arising under their contract, questions concerning the validity of the entire contract are to be resolved by the arbitrator in the first instance, not by a federal or state court. *Preston v. Ferrer*, 552 U.S. 346, 349 (2008).

In *Rent-A-Center*, the United States Supreme Court acknowledged the right of parties to include delegation clauses in arbitration agreements, whereby they "agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center*, 561 U.S. at 68-69 (citing *Howsam,* 537 U.S. at 83-85). To be enforceable, such delegation clauses are subject to a heightened standard, *i.e.*, the parties' intent to arbitrate the issue of arbitrability must be demonstrated by "clear and unmistakable evidence." *Id.* at 79; *see First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citation omitted). Unless a party specifically and discretely challenges a clear and unmistakable delegation of authority to the arbitrator, any challenge to the validity or enforceability of the entire arbitration agreement is subject to arbitration and must be left for the arbitrator to resolve. *Rent-A-Center*, 561 U.S. at 70-71.

Here, it is *clear* and *unmistakable* that MyLife's Arbitration Agreement delegates the gateway determinations of arbitrability of Plaintiff's claims, as well as questions of the arbitrability, interpretation and scope of the Arbitration Agreement, to the arbitrator. The

RASKIN GORHAM ANDERSON LAW

Raina Borrelli
December 16, 2021
Page 6

User Agreement clearly and unmistakably indicates that "MyLife.com® and [Plaintiff] . . . agree to arbitrate all disputes and claims arising out of or relating to this Agreement between MyLife.com® and [Plaintiff] . . . [a]ll issues are for the arbitrator to decide, including the scope of this arbitration clause." This is a typical broad delegation provision concerning the threshold issue of arbitrability, and according to the overwhelming authority, the Court must compel arbitration of Mr. Uharriet's claims without addressing the merits of the Mr. Uharriet's potential challenges to arbitrability or the validity or enforceability of the agreement to arbitrate.

**2.    The Claims Are Barred By The Communications Decency Act.**

Section 230 of the Communications Decency Act ("CDA") provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Courts in the Ninth Circuit have applied Section 230 to bar a variety of state court actions, including under right of publicity laws. See, e.g. *Caraccioli v. Facebook, Inc.*, 700 F. App'x 588, 590 (9th Cir. 2017) ("intrusion upon seclusion," California Unfair Competition Law); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122, 1125 (9th Cir. 2003) (California right of publicity); *Jurin v. Google Inc.*, 695 F. Supp. 2d 1117, 1122–23 (E.D. Cal. 2010) (unjust enrichment).

The Ninth Circuit has read Section 230 "to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third party user of the service." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (quotation marks and citation omitted, emphasis added). District courts within the Ninth Circuit have held that "the immunity extends to all claims stemming from an interactive computer service provider's publication of content created by third parties." *Coffee v. Google, LLC*, No. 20-cv-03901-BLF, 2021 WL 493387, at *4 (N.D. Cal. Feb. 10, 2021) (emphasis added); see also *Goddard v. Google, Inc.*, No. 08-cv-02738-JF, 2008 WL 5245490, at *2 (N.D. Cal. Dec. 17, 2008) ("[P]arties complaining that they were harmed by a Web site's publication of user-generated content ... may sue the third party user who generated the content, but not the interactive computer service that enabled them to publish the content online." (quotation marks and citation omitted)).

Consistent with the CDA's definition of an "interactive computer service," MyLife is an "information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet . . . ." 47 U.S.C. § 230(f)(2); cf. Obado, 2014 WL 3778261, at *4 (finding "no dispute that" Intelius, a MyLife competitor, provided an interactive computer service). The FAC acknowledges that MyLife disclosed that it "aggregates publicly available information from government, social, and other sources, plus personal reviews written by others" (FAC, ¶ 12) and that Plaintiffs "do not know" any facts to the contrary. (FAC, ¶ 12) Screenshots from the MyLife website disclose that MyLife gathers "public reputation and

RASKIN GORHAM ANDERSON LAW

Raina Borrelli
December 16, 2021
Page 7

background info." (FAC, ¶ 41) MyLife already has been found to be an interactive computer service. See *Shah v. MyLife.Com, Inc.*, No. 3:12-cv-1592-ST, 2012 WL 4863696, at *3 (D. Or. Sept. 21, 2012) ("MyLife.com, Inc., . . . fall[s] within the definition of an 'interactive computer service.'"), R&R adopted, 2012 WL 4863271 (D. Or. Oct. 11, 2012). Certainly Plaintiffs' claims treat MyLife "as the publisher or speaker of information." The theory for relief is that MyLife discloses certain information.

The final element required for Plaintiffs' claims to be barred by the CDA is satisfied because "the challenged communication [is] information provided by another information content provider." Thus, as the court held in *Shah v. MyLife.com, Inc.*: MyLife "cannot be sued for simply republishing information provided by third parties, including any claim under state law for invasion of privacy by an internet posting of person information obtained from another party." 2012 WL 4863696, at *3.

Please let me know when you are available to discuss this further.

Best Regards,

Gary J. Gorham

GJG:sm
cc:     Michael F. Ram          (MRam@forthepeople.com)
        Marie N. Appel          (MAppel@forthepeople.com)
        Benjamin R. Osborn      (Ben@benosbornlaw.com)
        Sam Strauss             (Sam@turkestrauss.com)
        Lucy H. Mekhael         (LMekhael@raskinlawllp.com)

# Turke & Strauss LLP

Raina C. Borrelli
raina@turkestrauss.com

December 20, 2021

*Via E-Mail*
Gary Gorham
ggorham@raskinlawllp.com

   **Re:**  **Uharriet v. MyLife.com, Inc., 3:21-cv-08229-VC**

Dear Gary,

I write in response to your letter dated December 16, 2021.

## MyLife's Proposed Motion to Compel Arbitration is Baseless

First, our position with respect to arbitration has not changed since our November 29, 2021, letter to you. Again, Mr. Uharriet has never visited any page on the website www.mylife.com, let alone affirmatively agreed to MyLife's User Agreement or Privacy Policy. Attorney Benjamin Osborn visited MyLife.com as part of his duties under Fed. R. Civ. P. 11 and 12 while investigating Mr. Uharriett's legal claims against MyLife.com. When solicited by the mylife.com website, Mr. Osborn accurately entered his own first name, last name, zip code, and email address. He did not enter Mr. Uharriet's information. Mr. Osborn kept a contemporaneous record of all the pages he visited on MyLife.com to investigate Mr. Uharriett's claim and prepare the complaint.

As a result, Plaintiffs have difficulty understanding how MyLife could possibly assert that Mr. Uharriet himself visited the "Join for Free Access to MyLife" page on MyLife's site, entered his name, city, state and date of birth, along with an email address, then clicked "Join For Free." Again, to be clear, Mr. Uharriet absolutely did not do so, and MyLife has not shown us any evidence otherwise.

MyLife's insistence on pursuing a motion to compel arbitration against Mr. Uharriet without any evidence that Mr. Uharriet registered for MyLife is troubling. Before filing that motion, Plaintiffs ask that you share all factual evidence you intend to use to support that motion so that we may evaluate it and provide a more substantive response to the arguments raised in your letter.

## Plaintiffs' Claims Are Not Barred by the Communications Decency Act ("CDA")

Second, Plaintiffs disagree that their claims are barred by the Communications Decency Act ("CDA"). MyLife's misappropriation of Plaintiffs' names, personal information, and personas is not protected by § 230 of the CDA because, under controlling Ninth Circuit authority, a website enjoys immunity only for content the creator intended to be published on the Internet. *Batzel v. Smith*, 333 F.3d 1018, 1034 (9th Cir. 2003), *superseded in part by statute on other grounds as stated in Breazeale v. Victim Servs., Inc.*, 878

F.3d 759, 766–67 (9th Cir. 2017) (CDA immunity exists only "when a third person or entity that created or developed the information in question furnished it to the provider or user under circumstances in which a reasonable person . . . would conclude that the information *was provided for publication on the Internet*.") (emphasis added); *Fair v. Roommates*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) ("[I]f the editor publishes material that *he does not believe was tendered to him for posting online*, then he is the one making the affirmative decision to publish, and so he . . . [is] not entitled to CDA immunity.") (emphasis added).

A court recently followed similar reasoning to deny CDA immunity in a statutory right to publicity case against the websites Instant Checkmate and Whitepages. *Lukis v. Whitepages Inc.*, 454 F. Supp. 3d 746 (N.D. Ill. 2020). Like in that case, mylife.com is a website *owned and operated by the defendant MyLife*. And like MyLife, both Whitepages and Instant Checkmate profit by selling access to personal information they gathered without permission from the authors. *Id.* at 752-56. The Court reasoned that because the website had "actively compiled and collated, from several sources, information regarding [the plaintiff]", it could not claim to be publishing information "provided by another information content provider." *Id.* at 763. Similarly, in *Federal Trade Commission v. Accusearch, Inc.*, No. 06-CV-105-D, 2007 WL 4356786 (D. Wyo. Sep. 28, 2007), *aff'd*, 570 F.3d 1187 (10th Cir. 2009), CDA immunity did not apply to a website selling phone records online. Although the phone records "were created (at least originally) by various telephone companies for lawful purposes," because the companies had not willingly provided the phone records for publication online, the phone records were not "provided by another information content provider." *Id.* at *6.

A number of recent decisions rejected assertions of CDA immunity in similar cases, and there is no reason to believe that a different result would be reached here. *See Callahan v. PeopleConnect, Inc.*, No. 20-CV-09203-EMC, 2021 WL 5050079, at *5 (N.D. Cal. Nov. 1, 2021) ("PeopleConnect cannot claim the benefit of CDA immunity, absent a reasonable basis to believe that the yearbook authors/publishers intended for there to be publication on the Internet"); *Knapke v. Peopleconnect Inc.*, No. C21-262 MJP, 2021 WL 3510350 at *4 (W.D. Wash Aug. 10, 2021) (concluding that PeopleConnect's "customized advertisement" involving the use of a yearbook photograph was not protected by the CDA and that PeopleConnect was not just the publisher of content provided by someone else but rather was "the publisher of its own content, which is unprotected by the CDA"); *Sessa v. Ancestry.com Ops. Inc.*, No. 2:20-cv-02292-GMN-BNW, 2021 WL 4245359 at *11 (D. Nev. Sept. 16, 2021).

Please confirm that these are the only bases on which MyLife anticipates bringing a motion. Additionally, as noted above, please produce all factual evidence you intend to use to support a motion to compel arbitration as to Mr. Uharriet by December 22, 2021.

We are happy to discuss these issues further by telephone. Very truly yours,

TURKE & STRAUSS LLP

Raina C. Borrelli